PEDRO TREVINO AND OTHERS V. ANTONIO FERNANDEZ AND OTHERS.

In the case of McMulllen v. Hodge, (5 Tex. R. 37, 59,) the counsel on both sides conceded that such grants (composition) gave but a tenancy at will; and the Court, acting doubtless on the presumption of the correctness of these admissions, treated the title as conveying only such limited estate. Nevertheless, the grant in that case was upon such terms as rendered it inchoate, and it had become extinct.

The words " censo al quitar" in a composition grant do not signify that a tenancy at will only is thereby conveyed, as translated in White's Recopilacion, (2 vol. p. 53,) but that the land is conveyed subject to an annuity in ground rent, redeemable at the will of the grantee.

There are three principal species of " censo"; emphyteutic, where the usufruct only was conveyed ; consignative, where money advanced is charged on land ; and reservative, where the complete title is transferred to the grantee ; and the " censo al quitar," or redeemable censo, is always of the latter description.

No doubt conditions might be imposed on composition as well as on other titles ; as, for instance, in the grant under which McMullen claimed, there was a restraint on the power of alienation. But such restrictions are not imposed, merely because titles are by composition. The laws no where give countenance to the idea that a title by composition is not as perfect and as ample as that by sale.

The media annata were not the rents payable half yearly, as suggested in the case of McMullen v. Hodge, but the half of the estimated income or rent for the first year ; and they were chargeable not only on composition, but on all grants, titles and offices whatever.

These lands were jointly denounced by two, and the title recited payment of the price by both, and the title was descriptive of the land, commanding the proper officer to put the grantees in possession : the putting one in possession enured to the benefit of both.

Trevino  v.  Fernandez.

See this case as to prescription under the Mexican laws.

The acts of the Mexican authorities in the territory adjacent to the Rio Grande, while that territory remained *de facto* under their control, although subsequent to the declaration of her boundary by the Republic of Texas, in the ordinary administration of the laws and municipal affairs, so far as individuals were concerned, were as valid and binding as if done by the Government *de jure* as well as *de facto*.

Where the judgment of a Mexican tribunal had been appealed from, and there was no showing that the appeal had been disposed of before Mexico ceased to have any actual control over the territory where the land lay, it was held that the judgment was not final, and that the successful party could not defend under it, although the appeal had not operated as a supersedeas and he had been placed in possession by a proper officer.

Although the proceedings of a Mexican tribunal to carry its decree into execution, assume something of a judicial form, yet the decree itself ought to be produced.

Where an action of trespass to try title was brought August 8th, 1850, and the defendants answered November 11th, 1850, denying all and singular, &c., and claimed title in themselves to one-half the land sued for, admitting that the plaintiffs owned the other half ; and it appeared from the testimony that the defendants had been in possession three years claiming the one-half adversely as their own, (the plaintiffs being also in possession at same time,) and insisted, in support of the judgment which was in their favor in the Court below, on the three years limitation, the Court said the defence should have been specially pleaded, and rejected the defence.

It seems that where a jury is waived and a statement of facts for the Supreme Court is made up as in ordinary cases, the statement of facts may be treated on appeal as a case stated, and if the judgment be reversed, such judgment may be rendered as should have been rendered in the Court below.

Appeal from Cameron. Action of trespass to try title, commenced August 8th, 1850, by the appellants against the appellees, to the "Agostadero de San Pedro de Carricitos," fronting on the Rio Grande, containing eleven leagues of land. The plaintiffs claimed as the heirs of Bartolome Fernandez, by virtue of a grant made in 1789, to Bartolome and Eugenio Fernandez, brothers, alleging that Bartolome had paid all the purchase money, and that Eugenio had abandoned and relinquished all his interest to Bartolome. The defendants answered November 11th, 1850, denying all and singular, &c., then admitting the grant, and denying the abandonment or relinquishment by Eugenio, and claiming title to the one-half as the heirs of Eugenio ; and pleading the judgment of the tribunal of justice of the State of Tamaulipas rendered in

their favor in 1844, in pursuance of which they were judici-
ally put in possession of the one-half of said lands. The
heirships of the parties was either proved or admitted. It
appeared from the testimony that for some time after the grant
Bartolome and Eugenio both occupied and cultivated the said
lands, claiming them as the property of both. The weight
of the testimony was that from the beginning of the present
century at least, Bartolome and his heirs claimed the whole
grant and exercised exclusive control over it as proprietors
thereof, until 1842, when the sons of Eugenio discovered for
the first time that they had any claim to the lands, and insti-
tuted proceedings in the Court at Matamoros to establish their
right, which proceedings resulted in a judgment in their favor,
in pursuance of which they were put into actual possession,
in 1844, by the process of the Court. The heirs of Bartol-
eme, however, appealed, and it did not appear that the appeal
had ever been determined; the last entry that could be found
being a receipt of the appellee's counsel for the papers, given
to the clerk of the appellate Court at Victoria. From the
time when the defendants were put in possession as aforesaid,
they continued in possession claiming one-half the land. The
plaintiffs were also in possession at same time, and still con-
tinued in possession.

A jury was waived and the case submitted to the Court.
The Court gave judgment that the defendants were not guilty
of the alleged trespasses, &c.; and the costs. There was a
statement of the facts in evidence, signed by the attorneys of
the parties and by the judge as in ordinary cases.

The title covered twenty-eight pages of foolscap; much of
it illegible in the original, and much more unintelligible in
the translation; but so far as it could be made out, (and
enough was legible and intelligible to show that,) it was a
grant by order of the royal audience at Mexico, in the ordi-
nary form of that day, except that it showed that the grantees
had previously occupied it, and that it was appraised, and
then put up at sale, bringing $52.

*Allen & Hale*, for appellants. There are in fact but two questions to be determined; first, are the plaintiffs under the pleadings and proof entitled to any portion of the land described in their petition, and secondly, to how much ?

I. It is evident that if the plaintiffs have made a case which entitles them to recover any part of the land, although claiming the whole, judgment should have been rendered for them for such portion; (Davis v. Whitesides, 1 Bibb, R. 510; Todd v. McGee, 2 Id. 350; Ward v. Harrison, 3 Id. 304; Gist v. Robinet, 3 Id. 2; Harrison v. Stevens, 12 Wend. R. 170; Van Alstyne v. Spraker, 13 Id. 578; Inglis v. Trustees of Sailor's Snag Harbor, 3 Peters, 182, 2 Green. Ev. Sec. 317; Scott v. Rhea, 5 Tex. R. 258,) and a portion under the prayer for general relief in our practice. (Hardy v. De Leon, 5 Tex. R. 246; Bradbury v. Williams, Galveston, 1853; Hart. Dig. Art. 646.)

II. The defendants as well as the intervenors, claiming under the same grant as the plaintiffs, cannot question its validity, nor do they attempt to do so. It is true that the answer of the defendants denies generally the allegations in the *original* petition: but as that petition does not set up the grant, but only a general title to the whole tract, the denial does not call the grant in question, and the answer goes on, not in a distinct plea, but *uno platu*, to recognize and assert the grant; and to concede that the defendants are only entitled to one-half of it. It is an elementary principle of law, that a party in possession and claiming title under a grant or other conveyance cannot dispute its validity. (2 Green. Ev. Sec. 307; Adams on Eject. 56, note 1; 2 Starkie Ev. 424, note B; Milun v. Riley, 1 Dana, R. 359; McClain v. Gregg, 2 A. K. Marsh. R. 454; Denn v. Cornell, 3 Johns. Ca. 174.)

It is also admitted in the statement of facts, and appears in the evidence, that the plaintiffs and defendants claim under the same original title, and that the defendants are now in possession as heirs of Eugenio Fernandez. The grant therefore to Bartolome and Eugenio is not drawn in question, nor was it

before the Court below, and that Court erred therefore in deciding on its character or validity. It is no part of the office of a Court to determine the absolute right nor to decide *in rem* in ordinary suits. It is only to adjudicate between the parties as to their relative rights, and what the parties admit, it should also receive as proved. In the present case, even if the original grant were invalid, the recognition and admission of it by the Court for the purpose of determing under it the respective shares of parties would affect no one else besides those parties immediately before it; and as they made no issue of this kind, the Court ought not to have raised it.

III. But if it should be admissible for the Court below or this Court to look into the nature and validity of the original title, it is clear that it is sufficient in law to sustain the action. The Judge before whom the cause was tried, although himself of this opinion, supposed he was bound under the decision in the case of McMullen v. Hodge, (5 Tex. 34,) to reject the grant made in 1789, to the brothers Fernandez, as inchoate and imperfect, and vesting no legal title in the grantees. This conclusion rested upon two grounds, first, that the decision above mentioned was a final settlement of all questions arising as to the effect of composition grants (so called); and secondly, that the grant in question was of similar character to those referred to under that description. We will endeavor to controvert these assumptions.

First: we do not think that the language of the Court, in the case alluded to, was intended to extend to the determination of the effect or nature of composition grants generally. That was not in dispute in the case. It was conceded by the counsel on both sides that such grants merely gave a tenancy at will, (5 Tex. 37, 59,) but it was contended that the grant to the Indians did not come within this class. And the counsel also adopt without hesitation the incorrect and absurd translation given by White of the passage in the Recopilacion de Indias, (Book IV, Tit. 12, L. 15,) upon which the question turned. This Court therefore, in its remarks upon this point,

assumed what the counsel had conceded, to be correct, and only applied these admissions to the case before it. We may therefore, without presuming to argue against a settled opinion of the Court, consider this still as an open question, with the greater propriety, as it is of great importance in the settlement of land titles in the western portion of the State, and deserves a thorough investigation.

The remarks of this Court as to the nature of grants made under the regulations prescribed in the Recopilacion de Indias, rest upon the translation given by Mr. White of the phrase "*censo al quitar*," occurring in l. 15, Tit. 12, 13, B. IV of that collection, which is rendered by him as "tenants at will," and also upon the origin and character attributed to the tax or duty imposed upon such grants and known as *media annata*. It is assumed, (owing undoubtedly to the mistake of the counsel,) that this tax was only imposed upon feuds, vesting no absolute fee, and amounted in fact to an annual payment in the nature of rent, of half the income or profits of the land, in which the grantee had thus only a bare usufructuary interest.

The incorrectness of these premises will appear from the following considerations:

The term "*censo al quitar*," which designates not the nature of the estate conveyed, but the mode of securing the payment of the purchase money, cannot in any sense or connection whatever imply a tenancy at will, but an annuity charged upon the land, redeemable at the will of the possessor, who agrees to pay the purchase money in this manner, with the privilege of extinguishing at any time this encumbrance, by the payment of the value or amount of the annuity as determined by the laws of Spain. It is not in any way connected with a tenancy or usufructuary interest, because the only description of "*censo*" which is charged upon such an interest in land is not in the terms of the law ever ascribed as a "*censo al quitar*." The latter term always implies a conveyance of the full dominion, giving the grantee complete

and absolute power to sell, lease, convey or in any other manner dispose of the land subject to the encumbrance. And the "*censo al quitar*" may be either *a censo reservativo*, or *consignativo*. That is, it may either be a redeemable annuity, created out of the purchase money, and reserved in the sale, or one created by the loan of money or sale of other valuable articles, and charged upon land already belonging to the person assuming to pay the annuity. Both of these species of *censo* imply necessarily the absolute ownership of the land, in which the annuity is charged. The distinction between them and the *censo enfiteutico*, is broadly marked throughout the Spanish law. (Sala. Mex. ed. 1852, vol. 1; Febrero Adicionado, p. 1, Ch. VIII, Sec. 1, No. 4, vol. 2, 186; Id. Sec. 3; Escriche *Dicc. verb. censo consignativo, in fini;* Id. *verb. censo al quitar;* Nov. Rec. X, 15 l. 3; Id. l. 21; Id. l. 22, Sec. 3, 7; Id. l. 24, Sec. 1, 3, 6.)

The annual rate of interest or annual payment was fixed by the laws of Spain, as well as the mode of extinguishing the annuity, and both were different in the different kinds of *censo.* See the citations above. In America, the rate was five per cent. for *censos al quitar*, and one and a half for *censos enfiteuticos*. (Escriche *Dicc. verb. censo enfiteutico;* Cedula de 13 de Marzo, 1786.)

And all these provisions relate expressly to "*censos*" and "*censos al quitar*" imposed on the lands in possession of subjects under grants from the crown. (Nov. Rec. X, 15 l. 22, Sec. 3, 7; l. 24, Sec. 1, 3, 6.)

The simple composition grants made under the laws of the Recopilacion and the Royal Instruction of 1754, vested, it is true, the legal title as well as the beneficiary interest in the grantees, but the lands remained charged with the annuity based on the price, redeemable at the pleasure of the grantees. But in the subsequent practice, the sales, properly speaking (*ventas,*) were made for cash, the amount of the purchase money, bid at the auction sale, being paid to the officers of the Treasury before the making of the final grant, as was the

case with the title under consideration. The main object of the composition grants was to quiet the possession of actual occupants entitled to the exclusive enjoyment of the land from long residence, or other equitable circumstances. For the speedy and convenient settlement of the title of such occupants, and in order not to impose too heavy a burden upon them, they were authorized to acquire the ownership of their lands without the immediate payment of their value. The "censo al quitar," familiar to the laws of Castile, afforded the most eligible means to secure the rights of the Crown and of the grantees, and was therefore expressly adopted. But the object of the grants by way of sale was, not only to relieve the subjects of the King from disputes arising on their uncertain tenure of lands, but also to furnish an immediate income for the Crown. They were not therefore made like the composition grants, burdened with the interest of the purchase money, but were pure sales. The term "censo al quitar" ceased to be used in titles to land made after the instructions of 1754 had quieted the claims of prior occupants. (Ordenanzas de Tierras y Aquas, and authorities; *Recop. de Indias*, L. IV, Tit. 12; *Real Instruccion de* 1754; *Ordenanza de Intendentes*.)

The meaning of the term *media anata* is also misconceived in the opinion of the Court in McMullen v. Hodge. It does not imply an yearly payment in the nature of rent, but a tax or duty on the grant itself, imposed only once, at the time of issuing the title, and computed at one-half of the estimated income of the land or office granted, for the *first* year. It was a species of the *alcabala*, and corresponded as that did, to the English stamp duties. It was imposed equally on all grants, whether absolute or conditional, proprietary or usufructuary. (Rec. Ind. VIII, 19 l. 4 and note 1 to l. 1; Escriche Dicc. *media-anata* or *anata*.)

But even if the original grant was not effected to pass the absolute title in fee to the grantee, still such a title would be presumed from lapse of time and continuous possession for

more than forty years, and such possession is abundantly proved. (*Rec. de Indias*, L. IV, Tit. 12, l. 15.)

And the title to that extent was recognized by the political authorities, the Governor of the colony of New Santander, and by the Inferior and Supreme Courts of the State of Tamaulipas.

IV. Assuming, then, that the grant to Bartolome and Eugenio Fernandez vested a sufficient legal title, we shall endeavor, in the next place, to show that the present plaintiffs, together with the intervenors, claiming under Bartolome, have acquired title to the whole of the land to the exclusion of the heirs of Eugenio. This position rests upon two grounds, first, that the title of possession was extended to Bartolome alone, after a determination of his right to the entirety by the Governor of the colony of New Santander; and secondly, that Bartolome and those claiming under him have been in possession adversely to Eugenio and his heirs, for more than the legal period by which title is acquired by prescription.

1. It appears by the petition for the title of possession presented to the Governor of the Province, Don Melchior Vidal de Lorca y Villena, in 1789, by the order and commission granted by that officer, by the proceedings of the Teniente Justicia, Mayor of the Town of Reynosa, and the final act of possession, that Bartolome alone applied for the possession of the entire tract as his property, that the original grant was submitted to the Governor for examination, that the possession was ordered to be given to him alone, and that he was formally placed in possession, in the presence of all the neighbors, without opposition, of the whole tract, as absolute owner, on the 4th of May, 1789, paying the costs of the proceedings. We contend that it follows from these facts, apparent on the title papers, that the Governor of the Province, either in his judicial or his executive capacity, must have decided that Bartolome alone was entitled to the land, and that his decision is conclusive; and this position is supported by the following considerations. The Governor of the Province, both as sub-

delegate, and in his ordinary functions, had a judicial character, and acted as a Judge, particularly in all questions relating to grants of land from the Crown. (*Rec. de Indias*, L. V, Tit. 2, laws 7, 11, 13, 19, 37, 39; *Real Instruccion de 1754*, Art. 11; United States v. Arredondo, 6 Peters, 747-8.)

And if in the present case, he acted merely in a ministerial and administrative capacity, still his acts will be presumed to have been within his authority, and after this lapse of time will not be questioned in our Courts. (United States v. Percheman, 7 Peters, 95.)

It is evident that the order to give exclusive possession to Bartolome could not have been made, without a consideration of the rival claim of Eugenio, because it is stated that the Governor had examined the original grant. It will be presumed that sufficient proof was laid before him of the relinquishment of Eugenio, or his want of just claim to a part interest in the land. But even if the title of Eugenio is admitted to have still subsisted, still the delivery of possession was necessary to complete his grant, (he not appearing to have been in actual possession,) and if that delivery was made, in fact, by the officers of the Crown to another party, the dominion or ownership was thereby absolutely transferred to such other party, and he, Eugenio, could no longer claim anything but compensation for his loss from the King. (Sala, Mex. ed. 1852; Febrero *Adicionado*, Part 1, Ch. X, Sec. 1; *Ventas*, Art. 20; Part V, Tit. 5, law 53; Pandect. Hisp. Mex. No. 3126; Escriche Dicc. *verb. Tradicion, entrega.*)

2. The plaintiffs have also acquired a title by prescription. The adverse possession of Bartolome commenced in 1789, when he went into possession of the entire tract, as sole owner, or at latest in 1791, when he made his will, declaring that he owned the whole of the land, and repudiating any claim on the part of Eugenio, on the ground that the latter had not assisted him in paying the purchase money and other dues. It appears by the testimony of all the witnesses, and especially by that of Antonio Garcia, Rafael Wreste, Monica Ribas,

Bartolo Trevino and Miguel Cabazos, that this adverse and exclusive possession continued in his widow and her devisee, Don Jose Maria de la Garza, and his heirs, up to the year 1844; that no other persons were known as owners, and no conflicting title was set up or heard of until 1842, and that the widow of Bartolome, and Don Jose Maria de la Garza, after her, claimed the entire estate as theirs. It is clear upon principle and authority that an adverse possession for more than thirty years, accompanied with public and notorious claim of exclusive right under any title, gives a title by prescription against even a tenant in-common under both the Civil and Common Law. (Trapleney *sur Prescription*, Sec. 360, 361; Angell on Limitations, p. 456–471.)

This adverse possession was not interrupted by suit nor by entry. It appears from the testimony, that Eugenio Fernandez was living on the land in question in 1787 or 1788 ; that in 1800 or 1805 he had removed to the Rancho Barranco on the other or western side of the Rio Grande; that he afterwards returned to the Carricitos lands, during the widowhood of Dona Rita, and lived there, at the principal Rancho, a short distance from the house of the widow, with her permission, doing odd jobs for his living, but making no claim to ownership of the land ; that he finally abandoned his residence there in 1808 or 1809, and removed to the Rancho of Santa Rosalia, at some distance, where he remained with his children, the present defendants, until his death; that Dona Rita claimed the entire tract, in his presence, and he made no objection to the claim, and never pretended to any right to the land even to his intimate friends.

But even if we give to the testimony its most favorable construction for the defendants, and admit that Eugenio may have occasionally claimed the land while living on it as a part owner, still it abundantly appears by the whole testimony, and even from the proceedings in the suit in 1844, that from the time of his removal and of Dona Rita's death, i. e., from 1808 or 1809, it was held adversely to him and his heirs with-

out controversy or rival claim, and with acts of exclusive possession, by parties deriving title under deeds and testamentary devises, altogether inconsistent with the title of Eugenio up to the year 1842, when the present plaintiffs appear to have first stirred in the matter. This was more than thirty years, and is sufficient to give the plaintiffs a prescriptive right.

The objection which may be made to the application of the foregoing reasoning, viz: that a part owner or joint proprietor cannot acquire a title by prescription against his co-tenants is not admissible in the present case, because it assumes that the possessor professes to hold the land in community (*de consenso*) and as undivided (*pro indiviso*.) In such a possession there is nothing adverse to the title of the absent co-tenants, and it will be presumed that the owner in possession, from his own admission as to the character of his holding, acts for all the proprietors. But where the possession is exclusive and adverse, and the land is not held as common and undivided property, the party in the actual occupancy holds it against all the world, and the ordinary principles governing prescription apply. (Troploney *sur Prescription*, Sec. 360, 361; Angell on Limitations, 456–471; cases before cited.)

And under the circumstances of the case, the long, adverse and undisturbed possession of Bartolome and his devisees, the acquiescence, silence, and abandonment of Eugenio, the fact that the latter never informed his children of his holding any claim to the land, and their entire ignorance of such claim, the Court may now well presume a release from Eugenio to Bartolome before 1789. (10 John. 376.)

V. It is however said, (and this is the chief reliance of the defendants,) that the title to the ownership of the land, and the respective rights of the parties was determined by the decree of the Court of the First Instance in Matamoros, sometime in 1842, in a suit between the same parties and for the same matter; that the decree adjudged one-half of the estate to the present defendants, and was duly carried into effect by a partition of the land, and by placing the heirs of Eugenio

in possession of their portion ; that these proceedings must be considered as conclusive, and ought to be confirmed in this Court.

It is to be observed that the sentence or decree of the Court in Matamoros, and the proceedings in the cause prior to such decree, were not produced, nor was any sufficient proof given of them, nor any sufficient reason assigned for the absence of such proof. It is indeed shown that the transcript of these proceedings, and the decree (*traslado por compulsa*) which had been sent to the Supreme Court of the State of Tamaulipas, was, by order of the Court, delivered to Jose Nunez de Carceres, the *abogado*, employed in that Court on the part of the heirs of Eugenio, but it is not shown why that transcript was not returned by Carceres, nor why it, or a copy of it, cannot still be produced.

The only inferential proof, (altogether incompetent in itself,) of the decree is that derived from the subsequent proceedings, by which it was carried into execution. This amounts, then, to an attempt to prove a judgment by an execution. But were this admissible, (as it clearly is not,) still these very proceedings show that the decree, whatever it was, which seems to have been rendered on the 12th of January, 1842, by the Inferior Court, in a suit in which the present defendants were plaintiffs, and Dona Rafaela, the mother of the present plaintiffs, was defendant, was not final and had not the character of *res adjudicata*, because an appeal was taken to the Supreme Court of Tamaulipas by the defendant or her attorney.

This appeal appears to be admitted on all hands, but the Judge of the Inferior Court said that it had only a devolutive, not a suspensive effect, and could not prevent him from proceeding to carry the former sentence into execution, referring to P. III, T. 22, 1. 19.

The transcript of the proceedings in the Supreme Court, before referred to, show that the cause was there pending when, on the 4th of March, 1845, the papers or transcript was delivered to the attorney of the heirs of Eugenio, and they

appear never to have been returned. Under the mode of procedure established in Courts governed by the laws of Spain and Mexico, the counsel for the appellee was required to return the transcript, with his answer to the "*agravios*," alleged by the appellant, within nine days after the *traslado*, or delivery to him. A failure to return the papers (*antos*) would, if persisted in, amount to *rebeldia*, and would authorize an affirmance of the sentence. And the appellants cannot be considered as at fault, if the decision of the cause in the Appellant's Court had been delayed by the act of the opposite party. (Sala. Mex. ed. 1852, vol. 2; Escriche *Dicc. verb. Apelacion.*)

It is also to be observed that the decree of the Judge in Matamoros was not rendered in a suit between the same parties as in the present case. Dona Rafaela, the defendant then, is now dead, and the present plaintiffs do not claim in privity of estate with her, but as heirs of her husband, their father. The decree is not competent evidence therefore, or a bar to the plaintiffs' right.

But even if the decree were sufficiently proved, and was operative and valid under the laws of Tamaulipas, it cannot be recognized in the Courts of this State, because it was rendered by a foreign Court having no jurisdiction over the person of the defendant, or over the land, the subject of the litigation. Foreign judgments are only received as evidence of right, from national comity, and it is an elementary principle that Courts of one State will not permit the laws or judicial proceedings of other countries to affect the title to real estate within its limits. (Glass *et al.* v. The Sloop Betsey, 3 Dall. 6; Rose v. Himely, 4 Cranch. 241.)

In the present case, the Court is bound by the action of the political authorities of the Republic, and the constant assertion of sovereign jurisdiction maintained by this country over the territory between the Rio Grande and Nueces, from December 19th, 1836. It has no discretion in the matter, and must necessarily deny any authority or jurisdiction in the

Courts of Tamaulipas over land within the limits of the Republic. (Foster *et al.* v. Neilson, 2 Peters, 254; Garcia v. Lee, 12 Peters, 511.)

This position is only controverted by the supposed principle that an enemy or neutral power, in actual possession of territory belonging to another sovereign, can exercise plenary jurisdiction *de facto*, so long as the occupation continues, and that acts done under this jurisdiction will be respected by the sovereign whose territory is thus invaded.

But the true principle to be derived from these cases is, that the jurisdiction thus acquired *de facto*, extends solely to belligerent rights, or to the mere municipal government of the occupied territory; or finally, to the local administration of a country, the ownership of which had not passed by actual cession or delivery. (Davis v. Police Jury of Concordia, 9 How. 280.)

The cases do not extend to an instance like this, where the sovereignty disputing the title of the foreign power *in toto*, as well as the fact of an independent and undisturbed possession, is called on to concede the validity of judgments made *de facto*, disposing of the title to land within the limits claimed for the new State. In the case of Rose v. Himely, it is evident that had St. Domingo been recognized by the United States as independent, the Supreme Court would have held the sentence of the French Prize Court, on that ground alone, as *coram non judice.*

VI. The plaintiffs and intervenors, together, are plainly entitled to the whole of the land, and their dispossession of a defined part gives them a right to a general recovery. The objection on the ground of their laches is too absurd to need argument. The proof is that they have always remained in possession of the *agostadero*, although driven from the Rancho, and were it otherwise, they have brought this suit within a proper time after the organization of Courts in that part of the State. The question, however, does not arise, as there is no demurrer or plea raising it.

VII. As between the plaintiffs and intervenors, the former are entitled to five-sixths. The land being in the possession of Bartolome and his wife, at the time of his death, will be presumed to be community property, and his will, therefore, was only effective to pass one-third of his half, or one-sixth of the whole to his bastard children. The rest was devised, by his will and that of Dona Rita, to Jose Maria de la Garza, and descended to the plaintiffs, heirs of the latter.

VIII. This Court has the right to enter a judgment here in conformity to the facts. The cause having been submitted to the Judge below, without a jury, comes up on the statement of facts as upon a special verdict, or a case stated. This Court has, by virtual agreement of the parties, the same right to decide that the Inferior Court possessed; and it is doubtful whether, after the waiver of a jury, a trial can ever be had before one. The judgment of this Court should therefore be, that the plaintiffs recover from the defendants five undivided sixth parts of the tract of land described in the amended petition, with their costs, and that the intervenors recover one undivided sixth part of the same land.

*Basse & Hord*, also for appellants.

*S. Powers*, for appellees. I. The pretention of the plaintiffs, that the act of delivery of the possession of the land, or the livery of seizin, having been made to one of the two grantees enured to one only, cannot be sustained. The possession of one of several joint tenants, tenants in common or co-parceners, is the possession of all of them; and the delivery of seizin to one is the delivery to all. (Coke's Institutes, Lib. 1, chap. 7, Sec. 59, note 2; Black Com, 311; Tillinghast's Adams on Eject. p. 55 and notes; Bacon's Ab. Vol. 3, 688, 689; Hilliard on Real Property, Vol. 1, 565.)

It is apparent that in this instance the delivery of seizin enured to both grantees, for the deed of cession in this instance contains an express injunction that neither party shall

be despoiled of his property without a hearing by the consent
of the Justice.

Besides, Eugenio as well as Bartolome had made substantial
improvements and stocked the lands with cattle, as appears
by the title grant itself. Surely the plaintiffs will not be per-
mitted to dispute their own evidence.

II. It is evident that no proceedings of a legal character
were ever had to dispossess Eugenio, or to forfeit his share of
the land for non-payment, and Bartolome nowhere pretends to
have any other right to the whole lands, than for having paid
for them, which is contrary to the title itself and contrary to
law. (Nov. Recop. Lib. XI. Tit. 34, law 2 ; Id. Lib. XI.
Tit. 8, law 1 ; Id. Lib. XI. Tit. 34, law 5.)

III. The plaintiffs' claim of a prescriptive right cannot be
sustained. It does not appear from the case and testimony
that Eugenio was ever evicted from the possession of the land.
The testimony rather shows that Eugenio, after the death of
his brother, which took place upon the lands, found it neces-
sary to live with his married daughters at Santa Rosalia, in
the immediate vicinity of the present town of Brownsville ;
that he left the possession voluntarily and without force ; and
that he did return to look after stock, &c., while he lived at
Santa Rosalia.

It further appears that two of the principal defendants, An-
tonio and Ramon, were for many years soldiers, which term
commenced before they attained their majority. (Nov. Rec.
Law 28, Tit. 29, Part 3.) Capistran testifies that he had
known Antonio and Ramon Fernandez for forty years ; that
then Antonio was about eighteen years of age ; that he had
been a soldier when he knew him first ; that Ramon was still
younger ; that they both continued to be soldiers for many
years, and that they knew nothing of their rights to the lands
in controversy until he informed them, about the year 1842,
when they immediately took measures to assert their claim.
(1 Mart. R. N. S. 324 ; Nov. Rec. Law 3, Tit. 29, Part 3 ;
Id. Law 4, Tit. 34, Part 11 ; Id. Law 8, Tit 29, Part 3.)

From these facts and others it is plain that no adverse possession could be set up against the claim of these defendants. No actual ouster is proven, nor even pretended, without which prescription will not lie. The heirs of Bartolome must be deemed the tenants at will of Eugenio's, so far as the claim to the whole tract is concerned. (Serg. & Rowl. R. 509; Id. 118; 4th Conds. & U. S. R. 426; 9 Wheaton R. 213; 13 Johns. R. 120, 121; 20 Id. 491; Tillinghast's Adams on Eject. 54.) The heirs of Eugenio in contemplation of law have never been out of possession. (Tillgh. Ad. on Eject. 54.)

It appears from the will of Bartolome that he for the first time then made a claim upon the whole ownership of the lands of the grant, by reason of the non-payment by Eugenio of his share of the expenses, and upon this fact alone. The fact that Eugenio continued for a number of years to live upon the grant after the death of Bartolome, shows that no ouster or disseizin followed this declaration; nor does there appear to have been any judicial proceedings to arrive at payment or composition. (Serg. & Rowl. 509; Tillgh. Ad. on Eject. 54; 6 Johns. R. 218; 5 Cowen, R. 374; 4 Johns. R. 390; Tillgh. Ad. Eject. 43.)

If the fact be as alleged by Bartolome, he had a right to call upon Eugenio for a compensation.

And though, as some of the plaintiffs' witnesses testify, Dona Rita leased portions of the lands and took the rents while Eugenio still lived there, yet this is no disseizin, nor ouster, because as joint tenants the possession and the title were a unity, and one co-tenant could not be ousted but by violence. (Bacon's Abrid. Vol. 3, JOINT TENANTS AND TENANTS IN COMMON, p. 671.)

At the Common Law one joint tenant, or tenant in common, had no remedy against the other for a separate enjoyment of the profits of the joint estate. (Bacon's Abrid. Vol. 3, p. 708.)

Again, the possession of the plaintiffs, even if of an adverse character, did not continue for thirty years, the time necessary to acquire a prescriptive right in this case.

The case shows that if a prescriptive right attaches at all it is upon a title acquired wrongfully, and in fraud of the rights of co-heirs, which requires thirty years to perfect it; and this time must be computed from the time Antonio, one of the defendants, became of age, which, by the testimony of Capistran must have been about 1818 or 1820, or from the time he first knew of his rights, and therefore the title by prescription would not be complete until 1848 or 1850, upon the supposition, be it understood, of a capacity to prescribe and be prescribed, which the defendants deny.

These parties stand to each other as trustees and *cestue que trust*, and the law will not allow the trustee to take a benefit against his *cestue que trust*. (Howard on Frauds, 481, 482, 484.)

2. The defendants further contend, that if prescription can be acquired, the circumstances of this case will only justify it to the extent of actual occupation and no further. If the plaintiffs ever entered to the detriment of the defendants, they did so without title, and therefore, as against the true owner, their rights are confined to the actual limits of their occupation. (Tillinghast's Adams on Eject. 54; 1st Paines' R. 458; 1 Sergt. & Rawl. 111; 3 Harr. & McHen. 621.)

Ignorance of our rights affords a just answer to a claim of prescription. And prescription only runs from the time of the discovery of his rights by the interested party.

As in cases of fraud, time or prescription only commences from its discovery. (2 Ves. Jun. 280; 10 Johns. R. 463; 4 Yeates. R. 109; Robertson on Fraud. Convey. 520.)

So in cases of infancy, time or prescription only commences from the majority of the party against whom such right is set up.

IV. The defendants also contend that if the plaintiffs began to acquire any rights to these lands by prescription, the same was interrupted and terminated in the year 1843, by the acts of the defendants themselves, and by the action of the existing and actual authorities of the Government *de facto*. (Nov.

Rec. L. XI. L. 6, Tit. 8; Id. L. 21, Tit. 29, Part 3; 1 White's Recop. 97.)

It is objected that the proceedings by which the exclusive possession of the plaintiffs was interrupted, were not regular and did not afford authority for the action of the authorities. By the defendants it is contended that the authenticity and legitimacy of these proceedings are recognized with the same force as the will of the said Bartolome. Each party acknowledges and agrees to the authenticity of the documents introduced by the other, for the purpose of obviating heavy costs. We say then that if they are evidence for one purpose they are for another, and they afford legal presumption of authority for the officers to do what they did, especially in view of the repeated acts of recognition on the parts of these plaintiffs themselves.

Assuming this position then, what effect did the adjudication in regard to these lands have, made in 1842 and 1843, and the subsequent act of partition by the Mexican Courts ? The defendants say it was legal and proper.

The country between the Rio Grande and the Nueces, with respect to the balance of Texas, by the actual prosecution of the American and Texas Arms to the former in 1846, must be regarded internationally as a conquered country. At the date of Texas Independence in 1836, no part of the State of Tamaulipas could be said to take part in the Revolution; and Corpus Christi, the only permanent post of Texas west of the Nueces, was not established until some years after the declaration of Independence. What then is the natural and reasonable condition of a country, claimed by a nation as a conquest, and yet not strong enough for some time to take actual and tangible possession of it ? The defendants contend that such a country, so far as its municipal affairs are concerned, adheres to its former and *de facto* allegiance until an actual occupation and reduction of the country takes place. (Vattel's L. of Nations; 9 How. U. S. R. 289; 8 Peters R. 308; 4 Cond. R. 444; 4 Wheat. R. 246.)

As Texas succeeded to the supreme dominion of this portion of Tamaulipas, she succeeded to the social and municipal affairs and condition of its people, and the acts of the pre-existing authorities in municipal matters, are to be taken as the acts of our own authorities; and hence the defendants say that the proceedings in question are to be taken by this Court in connection with the acts and admissions of the parties as legal, competent and valid. Continuous and uninterrupted possession is necessary to maintain a prescriptive right, and where a party relies upon his prescription he must exert a reasonable diligence in asserting it after its interruption, or he will be deemed to have waived it, and his previous possession will be held to have been in subordination to the title of the ejector, when such person unites in himself the legal and rightful ownership. (12 East. 141, 152.) For this reason the defendants contend that the claim of the plaintiffs is procrastinated and stale, and is barred by the statute of limitations of our own State; for the defendants possess not only the legal but just title, accompanied by actual possession, have complied with all the essential requisites of law to entitle them to the shortest term of prescription of three or five years. (Hart. Dig.) And further, that being the rightful owners in this instance, by the Spanish Law, even if a prescription in favor of the plaintiffs against the defendants had attached, the plaintiffs could not re-demand the possession of these lands.

What diligence have the plaintiffs manifested in setting up this claim? The county of Nueces was organized in the year 1846, one year after the final act of partition by the municipal authorities of Mexico, and the same year that our national banner was displayed for the first time on the confines of the Rio Grande. In the Fall of 1846, Courts were held at Corpus Christi, the seat of justice, and held thereafter regularly as prescribed by law. In the year 1848, the county of Cameron was organized, and in the Fall of that year Courts were holden in that county, and thereafter regularly, as prescribed by law.

Yet not till the 8th day of August, 1850, four years after the organization of Nueces county, and more than two years after the organization of Cameron county, did the plaintiffs bring this suit. The defendants contend that this silence, coupled with the previous conduct and admissions of the plaintiffs, has operated as a waiver of all previous objections to the le-legality and regularity of the municipal proceedings complained of.

V. The defendants further for themselves claim, that the title to the lands in controversy before the Court, was, by an Act of the Legislature of this State, approved ——— 1852, confirmed to Eugenio and Bartolome Fernandez, the said original grantees of the same, and to their heirs and legal representatives; that the said Act of confirmation was passed in conformity with, and in subordination to an Act of the Legislature of this State providing for the investigation of land titles in the counties west of the Nueces river, passed ——— 1850, before the institution of this suit. The parties of this suit presented the original title papers to the Commissioners for investigation. By the report of said Commissioners (page 39, No. 34 of the files of claims of Cameron county,) it appears that the title and claims of the respective parties were investigated and passed upon favorably; and by the laws of last session said title was confirmed to both the original grantees and their heirs.

The defendants contend that it was competent for the Legislature to confirm any previous action of the municipal authorities, had before the actual occupation of the country; and that if any legislative action were necessary to give such proceedings force and efficacy, the same are now adopted by the new Government, the highest political authority, and must stand confirmed and binding to all intents and purposes, as the proceedings in our own Courts.

By the Act of investigation, the Commissioners and the Legislature were to pass upon all the questions regarding such titles as might be presented, and all the equities and claims of

good faith attached to them, and it would be difficult for us to say, if we felt so disposed, upon what branch of a case or question the Commissioners or the Legislature had passed. So far is it impossible to separate the questions passed upon.

This Board for the investigation of land titles must be regarded as a tribunal *sui generis*, and to be kept within the political control of the Government, therefore strictly extra judicial in its action, yet supreme within the scope of its jurisdiction, which attached when the State had something to pass or something to confirm in regard to the rights of the lands and of the sovereignty under which they were acquired, either coming directly from the preceding sovereignty or through its municipal tribunals.

The respective parties applied to this tribunal and submitted to its jurisdiction, collaterally with that of the District Court and of this Court.

The result is that this legislative tribunal decided the question now before this Court after this cause was brought here on appeal, and a grave and important question now arises, how far this Court will ratify that decision in the present case. The defendants claim the benefit of this confirmation.

HEMPHILL, C. J. There were several errors assigned by appellant, which were condensed in the argument as specifying two grounds, viz:

1st. That the Court erred in not sustaining the title of the plaintiff to the entire tract; and

2d. In not giving judgment for such portion of the land as they were fairly entitled to recover.

The leading questions in this case are,

1st. Whether the original title under which both parties claim, is valid and such as should be recognized by Courts of law and Equity; and

2d. Whether the plaintiffs are entitled to the whole or only to one-half of the land, the defendants being entitled to the other moiety.

The grounds upon which the Court below decided against the plaintiffs do not distinctly appear from the record. But it is stated in the assignment of errors, that the Court on pronouncing judgment delivered a written opinion to the effect that neither party was entitled to the land, and from the argument of the appellants, it appears that this conclusion assumed for its basis that the grant, being by composition, was inchoate and imperfect, and vested no such right as could be judicially enforced. And it was further said that the Judge below was of opinion that the title was valid, but supposed himself bound, under the language of this Court relative to composition titles, in the case of McMullen v. Hodge, 5 Tex. R. 34, to reject the grant.

On examination and comparison of the titles, it will be found that there is a striking dissimilarity between the grant in McMullen v. Hodge and the one presented in this cause. In both the grant was by composition, but in the former it was to Indians of a Mission, with a prohibition against alienation without license, under the penalty of forfeiture of the grant. The title was held not to vest in the Indians belonging to the Mission at the time of the grant or their heirs, but to give a usufructuary right to such as should from time to time belong to the Mission ; and should that become extinct, no right would survive to the Indians, who were but pupils of the Mission, or their descendants ; that the Mission had been extinguished and their lands restored to the public domain before the rights of the plaintiff had accrued, under his purchase from the supposed descendants of the Mission. But in this case, the Primative Judge, waiving all defects and irregularities in the previous proceedings, &c., grants an ample title of property in the lands, without any exception or reservation whatever; and with the usual conditions of cultivation, and the liability of the lands to be used for public purposes, compensation being made, the lands are declared to be vested in the grantees, and their heirs and successors, as obtained by a just and legitimate title of property. The transfer of full dominion over the lands

could scarcely have been expressed in more ample terms ; and the title was to grantees who had the capacity to receive ; and its duration was not dependent upon such contingencies as affected the grant in the case of McMullen v. Hodge.

The only point in which there is any similarity, is, that in both the grant was expressed to be by composition. But this point of similarity does not necessarily impress them both with the same qualities in every particular. We have seen that one was of a limited character, subject to defeat and extinguishment on contingencies, which were not imposed on the other, the latter being a grant of absolute dominion. And whether the title be by gift, sale or composition, is not material, unless there be an inherent weakness in a composition title, which defeats the force of the grant expressed in its terms, and reduces it from one of full property to but a contingent or imperfect right.

And this leads us to inquire into the character of a composition title. In the case of McMullen v. Hodge, the counsel on both sides conceded that such grants gave but a tenancy at will; (5 Tex. R. 37, 59 ;) and the Court, acting doubtless on the presumption of the correctness of these admissions, treated the title as conveying only such limited estate. The admissions of counsel and the opinion of the Court were founded doubtless upon L. 15, Tit. 12, Lib. IV, Recop. de las Indias, as translated, in 2 White, p. 53, in which it is declared that all lands admitted to composition shall be sold at auction and without reserve to the highest bidder, as tenant at will, (*censo al quitar*,) agreeably to the law of the Kingdom of Castile. The original is in the following terms, viz: "*y todas las que* "*estuvieren por componer, absolutamente haran que se ven-* "*dan a vela y pregon, y rematen al mayor postor, dan-* "*doselas a razon de censo al quitar, conforme a las leyes y* "*pragm aticas de estos reinos de Castilla.*"

The question arises whether the translation as found in White be correct or not, and whether the grant of lands with a "*censo al quitar*" gives but a tenancy at will; and the

counsel of appellants; in a masterly exposition, contends that in no sense or connection whatever can these words imply but a tenancy at will, but on the contrary the "*censo al quitar*" is of that description of "*censo*" which implies a conveyance of the full dominion with absolute power of sale, release, conveyance or other disposition of the land, subject however to the eucumbrance.

In attempting to ascertain the intention of the law, we must first fix upon the signification of the word "*censo*," and then the phrase "*censo al quitar*."

Mr. Schmidt, in his Civil Law of Spain and Mexico, p. 321, translates the word "*censo*" as "ground rent." Mr. Johnson, in his translation of the Institutes of Asso and Manuel, gives annuities as the equivalent of the same term; and such annuity is defined by the said Asso and Manuel as a contract by which one person sells and another purchases a right to receive an annual pension or sum. (1 White, p. 145.) Febrero defines a "*censo*" to be an incumbrance which one imposes on his property in favor of another who advances him a certain capital, and that in that sense it was the right of receiving an annual pension, to secure the payment of which some other property is pledged. (Febrero Mejicano, Vol. 3. p. 101.) Sala defines it to be the right of exacting from another to whom we have granted something, an annual rent or pension. (Lib. II, Tit. 19, Sec. 2.)

It appearing that a "*censo*" is an annuity, we will inquire what species of "*censo*" is that which is denominated, "*al quitar*." And we find that in the Dictionaries of Escriche, of Salva and the late Dictionary de la Lengua Castellan, and in the works of Sala, Febrero and in the laws themselves, the words "*censo al quitar*" and *censo redimible*" are used as equivalent to and identical with each other, and that they both mean a redeemable annuity.

There are three principal species of "*censo*" as known to the laws of Spain, viz: the emphyteutic, the *consignativo*, and the *reservativo*. The emphyteutic is the right which one has

to exact from another a certain annual pension or sum, by virtue of a transfer to him of the usufructuary right of real property, the legal title remaining in the grantor. This estate is subject to several burthens and liable to forfeiture 'on several contingencies which we need not now specify. The *censo consignativo* is the right to exact from another an annuity in virtue of having advanced money, and which money is made a charge upon lands of the person who promises to pay the annuity, the full title to such lands, however, remaining in the grantor of the annuity.

The "*censo reservativo*" is the right to receive from another an annual pension by virtue of having transferred land to him by full and perfect title. (Sala.and Escriche *verbo* censo.) The incidents of a *censo consignativo* need not be discussed, as in no sense can they apply under the facts of this case. The grant is emphyteutic or reservative. In both, lands are given subject to annuity ; but in the first the transfer is only of the equitable right, the legal title remaining in the grantor ; whereas by the latter, both the legal and the equitable estates are conveyed to the grantee. That this is a reservative grant, viz: one/conveying full dominion, is manifest from the character of the annuity which by law is declared to attach to composition titles, viz: its redeemable quality. An emphyteutic annuity is not as a general rule redeemable ; and when a perpetual annuity in an emphyteutic contract is reduced to one which is redeemable, the grant loses its emphyteutic quality, and both the usufructuary and the direct dominion are passed to the grantee of the land. (Febrero Mejicano, 3 vol. p. 106, 115.)

It may be observed that for public purposes, by the laws of 1799, 1801 and 1805, every possessor of property, charged with an annuity, whether redeemable or irredeemable, and whether emphyteutic contracts or otherwise, was allowed to redeem it in Government paper. The law of 1805 was, however, repealed in 1818, and persons allowed in their annuity contracts to make such conditions as they pleased, and enforce their fulfilment. (Escriche.)

It seems then that a redeemable annuity, charged on land, is evidence of full dominion in the grantee; that he has more ample right than that derived from emphyteusis ; and that his estate, instead of being a tenancy at will, as known to the English law, is the very opposite ; that the only will about such title, is that of the tenant himself, who can, at his pleasure, redeem the annuity charged upon his land.

That a grant, which by its terms conveys full property, cannot be an emphyteusis, will be manifest from a glance at some of the incidents of an emphyteutic title. Among other rights, the grantor in such contract is entitled to preference as a purchaser, when a sale is to be made by the tenant and to notice of such sale under penalty of forfeiting the land ; and when he does not purchase, he has a right to the one-tenth, the one-twentieth or the one-fiftieth, as may have been agreed upon in the original deed. (Febrero, vol. 3. p. 104 ; Escriche.) No such conditions are expressed in this grant, nor are they attached to it by law. No doubt conditions might be imposed on composition as on other titles. As, for instance, in the grant under which McMullen claimed, there was a restraint on the power of alienation. But such restrictions are not imposed merely because titles are by composition. The laws nowhere give countenance to the idea that a title by composition is not as perfect and as ample as that by sale. In the ordinance of 1754, (2 White, 64,) titles by composition and by sale were classed together, and possessors of lands sold or compromised before the year 1700, on the exhibition of their titles, though not confirmed, were to be suffered to retain the free and quiet possession ; and those holding under sales or compromises after 1700 were not to be molested or disturbed. No distinction was made between sales and compromises. In the regulations of Morales, Art. 20, possessors were to be admitted to compromise, and after paying a just and moderate retribution, titles of property were to be delivered.

Where lands were admitted to compromise one would naturally suppose that the price would be adjusted by appraise-

ment or in some such mode. And this mode of fixing the price is contemplated by the Regulations of Morales, Art. 20 and 23; but, according to the terms of the law itself, and as it was executed in the titles on the Rio Grande, it is believed there was but little if any difference between the mode of granting, whether the adjudication was by composition or by way of sale. In either case the lands were exposed at auction and sold to the highest bidder. And in fact, though the Law 15, Tit. 12, Book 4, authorized lands sold on compromise to pass on a redeemable annuity, yet this grant does not seem chargeable with any such encumbrance. Where the purchase money is not paid at the sale, an annual interest might be taxed until the purchase money is discharged. And in the 24th Article of the Regulations of Morales, it was made lawful for purchasers who had not ready money to buy the lands at redeemable quit rent, during which they were required to pay five per cent. yearly. But where the whole of the purchase money is discharged, how an annuity or yearly interest on that purchase money can be chargeable on the land is unintelligible. In fact, in the nature of things no such annuity can exist. There might be some charge by way of quit rent, and which might be exacted and paid merely in acknowledgement of subjection. But a redeemable annuity, or a *"censo al quitar,"* can have no place when the sum, of which that annuity was merely the yearly interest, is paid. It is probable that the original Law of May 1631, by which composition lands were ordered to be given as a *"censo al quitar,"* contemplated no present payment of the purchase money, and imposed a yearly interest until the principal was redeemed; but that in process of time the practice was changed, and the price required to be paid when title was extended.

At all events there is no doubt that a grant by composition passed the title as completely as by sale, and that the grantee had as ample right as could have been conferred by any other species of title; and that if in fact there was any *censo* or annuity attached to composition titles at the date of this grant,

it was of a character which in itself imported full dominion in the grantees. There is nothing in the nature and object of a composition title, from which it could be inferred that it transferred but an imperfect right. Its purpose was to quiet a possession which had been already taken. This could not be done by granting but a tenancy at will. The idea of quieting a possessor by putting up his land at public auction and exacting from him the full price of a sale, and then giving him but a tenancy at will, is preposterous. The only difference between a title by composition, and that by pure sale, is one which is in favor of the former, viz: that it gives the possessor the lands which he has been occupying and improving. The translation of the phrase *"censo al quitar,"* as found in White, is believed to be utterly erroneous, and the very opposite of what was intended by the law.

The title in the case of McMullen v. Hodge was extended without requiring payment of the *media annata*. This was translated in the record without the payment of interest. The counsel for the appellee treated the *media annata* as a rent to be paid half yearly, and incident only to grants by composition. (5 Tex. R. p. 60.) The Court adopted the construction of counsel, that the *media annata* was rent payable half yearly. But this seems to be a misconception. The *media annata* were not the rents payable half yearly, but the half of the estimated income or rent for the first year; and they were chargeable not only on composition, but on all grants, titles and offices whatever. In Law 4, Book 8, Tit. 19, of the Recop. de las Indias, the King speaks of the imposition of the *media annata* for the benefit of the public treasury, and that by order of 22d May, 1631, it was to be paid on all offices and charges not ecclesiastic, paying for each office and grant the half of the income of the first year, and that this duty or tax was general and absolute, embracing even his own sons. And in the same Law, Rule 2, provision is made for the payment of the *media annata* in two instalments, viz: one-half on the delivery of the grant or office, and the other half within the year, extended in the Indias to one year and one-half.

That this is the correct definition of *media annata*, see the Dictionaries of Salva and Escriche.

In the Institutes of Asso and Manuel, as translated by Johnson, (1 White, p. 86,) it is said that homage and military service were annexed to feuds, until the duty paid in view of military service (*lanza*) and the *annats* of the half year, "*media annata*," were introduced as equivalent to them. In a note is the definition of Palacios that *lanzas* consist of a certain service in money which the nobles and grandees pay each year, and the *media annata* the sum paid for the title and honor.

The title in this case shows that full property was conveyed. Possession has been held under it for seventy years, almost double the time which, under the Spanish law, would be required to presume a grant. (2 White, 563.) And we are of opinion that the title was such as had judicial standing, and would authorize an action to try title, or any other proceeding necessary to enforce rights claimed under it.

The grant having been shown to be such as would pass the legal title, the next question is, whether the plaintiffs were entitled to recover the whole of the land ; and for this they contend on the grounds,

1st. That the title of the possession was extended to Bartolome alone, and

2d. That Bartolome and those claiming under him have been in adverse possession for more than the period required by the laws of prescription.

We are of opinion that the first ground cannot be maintained. Some of the documents appear to have not been inserted in the title ; but from the report of the Abagado Fiscal, the second paper in the proceedings, it appears that there had been before the grant an ocular inspection and survey of the lands ; and these lands having been denounced by both Bartolome and Eugenio Fernandes, and paid for by both, as appears from the deed itself, were granted by the Privative Judge in full and absolute property. True the Justice of the province is directed to place the parties in possession. This,

however, with reference to a title so complete as this, was but a ministerial act. He had no authority to depart from the grant, or to deprive one of the grantees of his right; and his act, placing one only in possession of the whole of the lands, must be regarded as enuring to the joint benefit of both.

But, although the act of possession to Bartolome may be regarded as for the benefit of both; yet it is very clear from the evidence, that Eugenio and his heirs were long before the commencement of this action barred of all title by prescription. The adverse possession of Bartolome commenced at the latest, in 1791, when by his last will he declared that he was the owner of the whole tract, expressly excluding Eugenio on the ground that he had paid no part of the purchase money or dues, the whole having been paid by the testator himself. The right of his wife, Dona Rita, to one-half by way of community, was recognized, and the other half was devised to her and two children of the testator in equal portions; and Dona Rita, the widow, subsequently bequeathed her portion of the land to her nephew, Don Jose Maria de la Garza, the father of the present plaintiffs.

The great weight of the evidence is, that not only was the land occupied by Bartolome and those who claim through him exclusively, and adversely to the right of Eugenio and those who claim under him, from 1791 to 1842; but that Eugenio himself, although he lived quite a number of years after the death of Bartolome, did not make any claim to the land. True he was living on it after the death of Bartolome, and for some four or five years afterwards, but the evidence, though somewhat conflicting, is that he did not hold himself out as owner, or as having title; whereas Dona Rita, the widow of Bartolome, was during this period in the performance of all those acts which indicate a full right of ownership. Some years before his death, Eugenio removed from the land and never returned; and a conclusive circumstance to show that the land had never been claimed by Eugenio, and that he acquiesced in the right set up by Bartolome, is the fact that his sons, who

must have been of some age before his death, had not, for more than thirty years afterwards, ever heard that their father had any interest or claim in the grant; and they were inform-ed of it for the first time, by one of the witnesses, in 1842.

There is no doubt that prescription commenced to run be-fore the death of Eugenio, and it continued notwithstanding the disability of minority of the children of Eugenio; and the fact that the sons were for some time soldiers, cannot avail them in this case, for the reason that it was not set up in the answer, nor is it supported by the evidence to any sufficient extent to be available; nor is there any probability that their service was so prolonged as not to leave sufficient time for the bar of twenty years to operate before eighteen hundred and forty-two.

It is however contended by defendants, that their title to ownership of the land, and the rights of the parties were de-termined by a decree of the Court of the First Instance in Mat-amoros, some time in the year 1842, in which half of the tract was adjudged to the present defendants, and that this was duly carried into effect by a survey and division of the tract, and by placing the defendants in possession of the portion assigned to them.

One of the objections urged to this decree is, that it was made by a foreign Court, having no jurisdiction over the per-son or subject matter, and that this Court is bound by the po-litical action of the authorities of the Republic, which on the 19th December, 1836, defined its boundaries, extending them to the Rio Grande, and that this excluded the jurisdiction or authority of the Courts of Tamaulipas over any lands lying within those limits. On the other hand it is insisted by de-fendants, that the country lying between the Nueces and the Rio Grande, though claimed by Texas, was not actually con-quered until 1846, and that until that time this territory, and especially the portion bordering on and adjacent to the Rio Grande, remained in the possession of, and under the laws, control and government of, the Republic of Mexico, and that

consequently all the acts of that Government or its authorities in the administration of its laws, and in the regulations of its municipal affairs, so far as the same affected the rights of individuals with each other, are as valid and binding as if done in the exercise of competent authority.

This is a subject of some difficulty, and of considerable interest doubtless to the country adjacent to the Rio Grande. For it is only in relation to this region, that the operation of these principles will be considered, the actual possession and control of the Mexican authorities being restricted in fact to limits at no great distance from that river.

And it appears from such examination as can now be given to the subject, that the assumption of the defentants as to the force of the acts of the Mexican authorities is well founded. Without entering into the considerations of policy, justice and humanity, which require of the Government *de facto* the preservation of order, and the adjustment of private rights and claims between individuals, I will refer at once to some authorities in which the effect of the acts of a Government *de facto* have been considered. The first case to which I shall refer is that of the United States v. Rice, 4 Wheat. 246. The town of Castine had been captured by the enemy on the first day of September, 1814, and remained in his exclusive possession until after the ratification of the treaty of peace in February, 1815. Goods were imported into Castine during that period, and paid duties prescribed by the Government in possession. After peace, duties were claimed on the same goods by the Government of the Unitad States, and the Court said such claim could not be sustained ; that by the surrender the inhabitants passed under a temporary allegiance to the British Government, and were bound by such laws and such only as it chose to recognize and enforce. No other laws could be obligatory, for where there is no protection or sovereignty, there can be no claim to obedience ; that Castine was in the same predicament that it would have been had it been a foreign territory, and ceded by treaty to the United States. In

Keene v. McDonough, 8 Peters, 310, some proceedings were had in 1803 and 1804, before the Governor of the port of Baton Rouge, relative to the purchase of lands at the sale of an estate. The adjudication to one purchaser was annulled, and the property finally adjudicated by decree to another. It was held by the Court, that the adjudication having been made by a Spanish tribunal after the cession of the country to the United States, did not make it void ; that the actual surrender of the territory did not take place until some time after these proceedings. It was the judgment therefore of a competent Spanish tribunal, having jurisdiction of the case, and rendered while the country, although ceded, was *de facto* in the possession of Spain and subject to Spanish laws. Such judgments, so far as they affect the private rights of the parties thereto, must be deemed valid.

In Davis v. the Police Jury of Concordia, 9 Howard, it was held that in a cession of territory the national character continues for commercial purposes until actual delivery; but between the time of signing the treaty and the actual delivery of the territory, the sovereignty of the ceding power ceases except for strictly municipal purposes, or such an exercise of it as is necessary to preserve and enforce the sanction of its social condition. But the power to grant lands, ferries, franchises, &c., is an attribute of sovereignty which ceases ; otherwise there might be a serious encroachment on the prerogatives of the succeeding sovereignty. In the Fama, 5 Robinson's Admiralty Reports, p. 107, Sir Wm. Scott was clearly of opinion that on the several grounds of reason or practice and judicial recognition, until possession was actually taken, the inhabitants of Louisiana continued under the former sovereignty of Spain.

In addition to these authorities, may be cited that of Pena y Pena, the illustrious Chief Justice of the Supreme Court of Mexico, who in his "Practica Forense," in treating of the validity of judgments or acts of judicial officers who are reputed to have competent authority, though in fact they had none,

applies the doctrines recognized in such cases to the acts of judicial officers during the period of revolutionary disturbances, when such officers are changed at every change of fortune, and as the one or the other party may have the predominance, says that all judicial acts done or authorized by an illegitimate authority (meaning a government *de facto*) might be regarded as null, and of no validity or effect, if the strict principle of law were alone considered ; but the essential good of the nation, and the peace and tranquility of its citizens, in relation to a branch so important as the judicial, demand that these should be legalized, and be held as valid and subsisting, since if it were not so, a door would be opened to an innumerable multitude of complaints, reclamations and attempts to undo all that had been done, so that nothing would be solid and stable ; the fortune and the property of the citizens would be consumed in the renewed expenses and damages which the multitude of suits would inflict ; and the people would be buried in a terrible chaos of judicial anarchy, more transcendental and pernicious than the illegitimate domination which it was designed to repudiate. (Vol. 2, p. 81.) It appears that a number of treatises were written on this subject, with reference to the effect of the acts of the French autorities in Spain during the period of the French conquests ; and from the author of a work entitled an " Examination into the Crimes of Infidelity to the Country, imputed to Spaniards who submitted to the authority of the French Government," a long extract is taken by Pena y Pena, from which we cite the following, viz:
" It is madness to suppose that a nation could exist (which
" would not conflict with and destroy itself,) without a public
" administration, and without laws ; and it is a dream to pre-
" tend that it could be governed by laws distinct from those
" given by the Government that has the power. There is but
" one of two alternatives, either that there should be no judi-
" cial proceedings among a conquered people, and all actions,
" beneficial or mischievous, be alike permitted, and all trans-
" gressions and crimes pass with impunity ; or judicial pro-

" ceedings must be tried and determined by the laws of the " conqueror. The first proposition is inadmissible, as by it " society would be ruined, and the second must not only be " tolerated but sanctioned, as the welfare of society cannot be " otherwise secured." In a note, Pena y Pena says, that so forcible and convincing, both in justice and policy, were the reasons in favor of conformity to the laws of the Government *de facto*, that they were adopted to some extent by the Spanish authorities in the civil wars between Spain and Mexico ; and notwithstanding their determined opposition to the independence of the Country, yet where the insurgents or republicans were predominant they admitted that payment of contributions to the rebels, as they were called, was not a crime against the country. See the Report of D. Miguel Bataller, the Auditor of War, to this effect. (Practica Forense, Vol. 2, p. 88.)

From these authorities it is manifest, that the acts of the Government in actual possession, in the ordinary administration of its laws, so far as they affect private rights, are valid, and can be set up to support an action or defend a right. Those affecting public rights are void and cannot be enforced.

The objection to the judicial proceedings, then, under which it is claimed that the rights of these parties to this land have been adjudicated, on the supposed ground of the want of authority in the Court over the subject matter, is not tenable.

But an objection, and one which is believed to be fatal to the conclusiveness of the Decree is, that it was not final when the Mexican authorities ceased to have jurisdiction. An appeal was then pending, which had not been determined ; and if there be fault with any of the parties, in protracting the appeal, it must be with the defendants, by whose attorney (if the record is properly understood) the papers were taken from the Court. It is very true, that the executive officer below regarded the appeal as only devolutive and not suspensive, and therefore carried it into execution by placing the defendants in possession. But, if the sentence had been reversed on appeal,

these proceedings would have gone for nothing, and the plaintiffs would have been restored to their original possession. In this condition of the proceedings the plaintiffs have a right to insist that there was no final decision against them, and that they are not restrained by the adjudication and proceedings under it, from asserting their rights in a new and distinct action.

This view of the effect of the want of finality in the proceedings will dispense with the necessity of discussing the question raised as to the insufficiency of the proof of the title under the documents offered in evidence by defendants, as the decree itself was not produced, but only the executive proceedings by which the decree was enforced. This is an objection of serious import. The well established rules of law is, that where title is claimed under judicial proceedings, as for instance under a Sheriff's sale, the execution must not only be produced but also the judgment, for they are all parts of the title. (Cowen and Hills notes, 2 part, 790.) And where a sale was under a decree of a Court of Chancery, and the purchaser, in deraigning title, produced a decretal order directing execution to issue on a prior decree recited in the decretal order, it was held that the original decree which was the basis of the execution, should be produced. (Wilson v. Conine, 2 John. 280.) It is admitted that proceedings to carry the judgment of a Spanish Court into execution assume something of a judicial form, and it may be said that in this case there was a species of sublitigation arising out of contests about enforcing the decree, and the parties might probably from their acts and admissions, be precluded from denying its existence, but still as this was the foundation of the authority on which the executive officer assumed to act, and without which his acts would have been wholly void, it would not be unreasonable to insist that this act, which is the basis of defendants' rights, should be produced. The production of the decree would save the necessity of inquiring whether, in the executory proceeding, there is sufficient evidence of such decree, and the conse-

quences which might ensue, were such evidence held insufficient. Where the decree was lost or not easily to be produced, a very different question would be presented.

It is objected in the argument by defendants, that the plaintiffs have been guilty of laches, and that more than three years elapsed after the organization of the Courts under this State, before the suit was commenced by the plaintiffs. This position need not be discussed. No such point was saved by the answer. There is a general allegation that the defendants are now and have been legally holding and occupying a portion of the lands from the date of the grant, but this is too vague to set up limitation under the special provision in regard to the three years limitation. It would not apprize the opposite party that any such right would be claimed.

This cause was submitted to the Judge below on a statement of facts, and this Court, having competent authority for that purpose, it is ordered that the judgment of the District Court be reversed, and that such judgment be here rendered as should have been pronounced below.

Reversed and re-formed.