Nelson Bunker **HUNT**

v.

**BP EXPLORATION COMPANY (LIBYA) LTD.**

No. CA-3-75-0715-G.

United States District Court, N. D. Texas, Dallas Division.

June 23, 1980.

Ivan Irwin, Jr., A. B. Conant, Jr. of Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., for plaintiff.

Mark Martin, Patrick F. McGowan, James K. Peden, Strasburger & Price, Dallas Tex., Sullivan & Cromwell, Robert MacCrate, James H. Carter, D. Stuart Meiklejohn, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

Nelson Bunker Hunt ("Hunt"), an American citizen, asks this court to declare that British Petroleum Exploration Company (Libya) Ltd. ("BP"), an English company, is indebted to him and that he owes BP nothing. BP has moved for summary judgment, asserting that Hunt's requested declaration cannot be granted because of a judgment entered in England by the High Court of Justice, Queen's Bench Division, Commercial Court, Cause 1975 B No. 4490 on June 30, 1978 (first part) and on March 26, 1979 (second part). Hunt replies that the English judgment is not entitled to recognition.

The court finds that the English judgment is entitled to recognition and that such recognition would bar most if not all of Hunt's claims in this litigation, but because the English judgment is on appeal the court cannot grant partial or complete summary judgment in favor of BP. The court stays proceedings in this case until appeals of the English judgment have been exhausted.

### I. Background of This Litigation

This parallel London/Dallas litigation stems from a relationship between BP and Hunt with respect to an oil field located in Concession No. 65 in Libya. In 1957, Libya granted Hunt Concession No. 65 in the province of Cyrenaica. In June, 1960, Hunt entered into a letter agreement as to Concession No. 65 with BP accompanied by an Operating Agreement, a proposed form of Assignment, and a specification of accounting procedures. The 1960 Agreement provided that Hunt would convey to BP an undivided one-half interest in Concession No. 65, plus a production payment, in return for BP making certain initial payments and being initially responsible for costs of exploration and development on Concession No. 65. BP was entitled to reimbursement of ⅜ of Hunt's ½ of the production payment. Clause 6 of the Letter Agreement provided that:

It is specifically understood and agreed that Hunt shall have no personal liability to repay the sums required in the Operating Agreement and this letter agreement to be advanced by BP for Hunt's account or paid to Hunt, but BP's right to recover any such sums which BP is required to pay or advance for Hunt's account shall be limited to recovery solely out of three-eighths (⅜) of Hunt's half of the production, and in the manner specified under Section 9 of the Operating Agreement, if, as and when provided, saved and delivered at the Libyan sea terminal.

As contemplated, Hunt in November, 1960, assigned the half interest and the production payment to BP. The Assignment provided, in part:

. . . Hunt hereby assigns to BP an undivided one-half (½) interest and title in and to the Concession, subject to the rights and obligations contained in the Concession.

. . . . .

BP shall be entitled to take and receive three-eighths (⅜) of Hunt's share of the oil production from the Concession delivered f. o. b. Libyan seaboard until BP has received a quantity of crude oil equal in value to one hundred and twenty-five per cent (125%) of all costs and expenses advanced by BP for Hunt's account on exploration, development or any other work performed in or in connection with the Concession.

BP struck oil in the conceded land, and developed what came to be known as "Sarir field." The exploration and development phases of the field were completed by the end of 1966, and export of oil began in January 1967. BP then received the first "reimbursement" oil toward repayment of the "farm-in" payments and of the expenses incurred on Hunt's behalf in the development stage 1960–1966.

In June 1967, the parties by a "Memorandum of Agreement" noted that "[t]he Letter Agreement dated 24th June 1960 and draft Operating Agreement between Nelson Bunker Hunt ("Hunt") and BP Exploration Company (Libya) Ltd. ("BP") are agreed to be amended as set out below with effect from 1st July 1967." It provided for certain reductions in BP's obligations and, in lieu of the 125% formula, set the total amount of oil that BP was entitled to under the production payment at 50 million barrels limited to 18,750 barrels per day of "reimbursement oil," or ⅜ of Hunt's share of daily production, whichever was less.

In December, 1971, the Libyan government nationalized BP's interest in Concession No. 65 and announced its proposed transfer to the Arabian Gulf Exploration Company (AGECO). AGECO is a joint stock company whose company was to be wholly owned by (Libya's) National Oil Corporation.

On May 24, 1973, Libya informed Hunt's representative in Benghazi, Libya, that no further oil would be delivered to Hunt's account. On June 11, 1973, the Libyan government passed a law purporting to nationalize all of Hunt's rights in Concession No. 65 and to transfer them to AGECO.

On November 20, 1974, BP reached an agreement with the Libyan government concerning the expropriation of BP's interests and other legal disputes between them. On May 19, 1975, Hunt and Libya entered into a similar settlement agreement. The Hunt-Libya agreement provided, among other things, that "[Libya] acknowledges full and final settlement of all claims it may have as successor in interest to BP Exploration Company (Libya) Limited."

On May 2, 1975, BP instituted suit in England, relying primarily on Section 1(3) of the Law Reform (Frustrated Contracts) Act, 1943 ("Act"). BP's claim under the Act was that its contract with Hunt was frustrated when BP's interest in the concession was expropriated, and that, because of BP's contractual performance before expropriation, Hunt obtained a valuable benefit. Hunt declined to accept service of the writ issued on May 2, 1975 through agents and solicitors in the U.K. and attempts to serve him personally during a short visit also provided unsuccessful. On June 19, 1975, the High Court of Justice, Queen's Bench Division, Commercial Court, granted BP's request for service by mail.

On July 23, 1975, Hunt sought dismissal of BP's suit on the basis that the court lacked jurisdiction. On November 4, 1975, Mr. Justice Kerr overruled the objection, concluding that the leave to serve out of the jurisdiction was properly given and Hunt's application to set aside service of notice of the writ and of all subsequent proceedings failed. Hunt filed a Notice of Appeal but did not pursue it further.

After filing of the English action but before service of process, Hunt filed this suit. Hunt sought "a declaration, based upon his contracts with BP that provided for 'no personal liability', that he owes no monies to BP, and that neither the Libyan

expropriation of BP's interests nor any other claims by BP abrogated this contractual protection." Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 5–6. BP moved to dismiss the complaint or in the alternative to stay the proceedings. Judge Hill of this Court overruled BP's motion on March 17, 1976. After further pretrial maneuverings, Hunt filed an amended complaint seeking a declaratory judgment limiting the liability of Hunt to BP and affirmative claims (i) under the Act (paragraphs 24, 25, and 26 of the Amended Complaint), (ii) that BP did not diligently develop the field or produce the field at its maximum efficient rate (paragraphs 28 and 29) "due diligence," (iii) that BP wrongly refused to seek resolution of its differences with Libya (paragraph 30), (iv) that BP breached its obligation to provide oil under clause 10 of the Letter Agreement (paragraph 31), and (v) that BP's mode of settlement with Libya was a breach of clause 22 of the operating agreement (paragraph 32).

Meanwhile in London, trial on the merits began on October 24, 1977 before Mr. Justice Goff of the Queen's Bench Division. On June 30, 1978, Mr. Justice Goff entered judgment against Hunt, and held that the counterclaim under the Act failed. He held that BP was entitled to recover approximately $35 million from Hunt under the Act, plus approximately 120,000 pounds on a related claim. Judgment (June 30, 1978), at 191 and 226. This was amended on March 26, 1979, to award BP $15,575,823 and £ 8,922,060. Both Hunt and BP appealed but the Court of Appeals in England has not yet decided the appeals.

## II. Relation of Recognition to Bar of the Present Litigation

"Res judicata" is often used to denote two things in respect to the effect of a valid final judgment:

(1) that such a judgment, when rendered on the merits, is an absolute bar to a subsequent action, between the same parties or those in privity with them, upon the same claim or demand; and (2) that such a judgment constitutes an estoppel between the same parties or those in privity with them, as to matters that were necessarily litigated or determined although the claim or demand in the subsequent action is different.

1B *Moore's Federal Practice* ¶ 0.405[1] at 621 (2d ed. 1974). The first concept is often called res judicata, strictly defined, and the second concept, collateral estoppel. Under res judicata, strictly defined, the judgment applies as a bar, preventing relitigation of all grounds for recovery or defenses available in relation to the same "claims" before the judgment court *regardless of whether all grounds for recovery or defenses were judicially determined.* Moore, *supra,* at 622–23; *see also Stevenson v. International Paper Co., Mobile, Alabama,* 516 F.2d 103, 109 (5th Cir. 1975).

Defining precisely the dimension of a "claim" or a single "cause of action" is difficult. Moore, *supra,* ¶ 0410[1] at 1154. The Fifth Circuit in *Kemp v. Birmingham News Co.,* 608 F.2d 1049, 1052 (5th Cir. 1979) stated:

Various tests have been advanced to determine whether the substance of two actions is the same for *res judicata* purposes: Is the same right infringed by the same wrong? Would a different judgment obtained in the second action impair right under the first judgment? Would the same evidence sustain both judgments? . . . This Court has recognized that the principal test for comparing causes of action is whether the primary right and duty or wrong are the same in each action. . . .

In applying the doctrine of *res judicata,* it is also important to keep in mind that *res judicata* is a principle of peace. . . . Under its influence an end in part to controversies. Parties and their privies are made to abide definitive and final judgments and litigations are concluded.

"When a defendant is accused of successive but nearly simultaneous acts, or acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the de-

fendant as well as the public convenience may require that they be dealt with in the same action." Restatement of Judgments Second ¶ 61, Comment d (Tent. Draft No. 5, 1978).

In cases involving contracts:

[A] plaintiff is . . . generally required to include in a simple action all breaches that have occurred before the beginning of the suit. If he fails to do so, judgment will bar any later recovery for breaches which had occurred before the action began, if the defendant has not waived the point, and subject to one exception. If the contract is regarded as separable or divisible, then the breaches of one part may be sued on separately from the breaches of the other part. Contracts are rarely treated as separable or divisible for this purpose, and the concept of divisibility is not clearly defined. . . . [T]he only safe guide is to assume that the obligations under a single contractual transaction are not divisible unless some concrete fact points affirmatively and fairly unequivocably to the unusual intent to have divisibility.

F. James & G. Hazard, *Civil Procedure* 551–52 (2d ed. 1977). *See also Nager Electric Co. v. United States*, 368 F.2d 847, 861 (Ct.Cl.1966).

There is a range of issues Hunt may not here litigate. That range of precluded issues spans not only those precluded by collateral estoppel but those precluded by res judicata as well. Many of the legal issues raised here were also raised in the English action. One of the two declarations Hunt prays for is that Hunt had no personal liability to repay any sums expended by BP. By awarding judgment against Hunt, the English court decided the issue of personal liability; in using the costs and expenses incurred by BP as an element of the judg-

ment, that Court decided that Hunt was liable for these sums expended. Judgment, June 30, 1978, at 191. And with one exception, Hunt's assertions of how BP may owe certain sums to Hunt appear to have been raised in the English action. Hunt litigated his affirmative claim under the Act (compare paragraphs 25 and 26 with Judgment, June 30, 1978, at 220), his "due diligence" allegations [1] (compare paragraphs 28 and 29 with Judgment, June 30, 1978, at 48, 48–123, 58, 83–85, 88, 92, 95, 112, 123, 148–49), his clause 10 allegations [1] (compare paragraph 31 with paragraph 25 of Hunt's "Re-Amended Points of Defense"), and his clause 22 allegation (compare paragraph 32 with paragraph 26 of Hunt's "Re-Amended Points of Defence").[2]

Thus even under the narrow reach of collateral estoppel, many issues are barred from relitigation here if the British judgment is recognized. The lines of the zone of preclusion by prior litigation, however, cannot now be precisely drawn. Their location has not been sufficiently explored. And because for unrelated reasons it is necessary to stay proceedings until appeals have been exhausted, it is unnecessary to now define the extent of preclusion mandated by collateral estoppel and res judicata.

In deciding to stay these proceedings, we are perforce deciding that the English judgment has a preclusive effect, albeit of an unmeasured reach. If the English judgment were not entitled to recognition, then Hunt would be free to proceed to trial on the merits here without preclusion of any issue. In staying the proceedings, society's interest in preventing relitigation, stability in legal relationships, and an end to litigation can be furthered without infringing Hunt's right to litigate any matters not precluded by the English litigation. *Cf.* Peterson, *Foreign County Judgments and*

---

1. Any due diligence violations, had they occurred, were held to be irrelevant to the award under the Act; any claims of breach of contract prior to frustration also appeared to have been held to be time-barred. Judgment, June 30, 1978, at 148–49.

2. The clause 10 and clause 22 allegations were abandoned at trial. *See* Judgment, June 30, 1978, at 226.

the Second Restatement of Conflict of Laws, 72 Colum.L.Rev. 220, 240 (1972). The court now turns to the question of why on the one hand the English judgment is entitled to recognition—and hence that Hunt cannot proceed—and why on the other hand, there is a present necessity for a stay. That is, the court cannot now grant BP's motion for summary judgment, either in part or in full.[3]

### III. The Elements of a Prima Facie Case for Recognition

#### A. Choice of Law.

█ In this diversity action, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires that a federal district court apply the law of the forum state. In *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the Supreme Court held that *Erie* required that the conflict of laws rules to be applied in a federal court must conform to those that would be applied in the courts of the forum state. *Id.*, at 496, 61 S.Ct. at 1021. Courts, both federal and state, in the absence of federal preemptive actions, have held that state law governs the recognition and enforcement of foreign-country judgments. R. von Mehren, *Enforcement of Foreign Judgments in the United States*, 17 Va. J. Int'l L. 401, 407 (1977). *See also Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 318 F.Supp. 161 (D.C.), 453 F.2d 435, 440 (3d Cir. 1971),

*cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972); *Toronto-Dominion Bank v. Hall*, 367 F.Supp. 1009, 1011–12 (E.D.Ark.1973).

█ By these principles this case should be decided under the law of Texas, but Texas law is uncertain as to the recognition of foreign country judgments. *See, e. g.*, Carl, *Recognition of Texas Judgments in Courts of Foreign Nations and Vice Versa*, 13 Hous.L.Rev. 680, 681–86 (1976). This uncertainty gives pause, and coupled with the realization that recognition of foreign judgments is an element of United States foreign policy, the law of Texas is not the sole referent.[4] *Cf. Her Majesty v. Gilbertson*, 597 F.2d 1161, 1163 (9th Cir. 1979); R. von Mehren, *supra*, at 407–08.

#### B. The Case Law of Recognition.

*Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), a pre-*Erie* case, is the leading American decision on the recognition and enforcement of foreign country judgments. R. von Mehren, *supra*, at 402; *Toronto-Dominion Bank v. Hall, supra*, at 1012. The Supreme Court held that:

[W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citi-

---

**3.** Hunt offers several reasons for opposing BP's motion for summary judgment aside from asserting that the English judgment is not entitled to recognition. These arguments can be dealt with summarily.

First, Hunt asserts that the court, in its order of March 17, 1979, rejecting BP's motion for dismissal of Hunt's suit or a stay pending a final determination by the English court already decided the res judicata question. The order issued before judgment in the English action cannot be said to have been premised on a res judicata theory.

Hunt also asserts that the English judgment does not answer certain issues present in this suit: the problem of applicable law, how that law applies, the meaning of the contractual language, construction of the contract, Hunt's intent with respect to the "no liability" provision, and so forth. Many of the issues raised in

the Dallas litigation are without question precluded as they have already been litigated. This is enough to justify staying proceedings in this case.

Hunt also asserts the English court did not decide according to Texas law, and if the English court erred in its determination of the applicable law, then the entire judgment is erroneous. The court in the recognizing forum does not sit as a court of appeal to determine the correctness of an initial judicial determination after making the decision to recognize.

**4.** Given the dearth of Texas authority, there is little if any difference in analytical focus or result between an effort to predict what the Texas courts would hold and an application of reasoned principles by reference to other jurisdictions.

zens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting, or fraud in the procuring of the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Id.* at 202–203. Despite this deferential language, the Supreme Court rejected enforcement of the French judgment on the ground that there was lack of "reciprocity" —because a French court which rendered the verdict would not give conclusive effect to that of an American court, the American court should not do so for a French judgment. *Id.* at 228.

*Phillips v. Lyons*, 1 Tex. 392 (1847), was the first Texas case to deal with recognition of foreign judgments. Carl, *supra,* at 681. Unfortunately, it is also one of the few to do so. Suit was brought in the Republic of Texas on the judgment of a Louisiana court. Justice Lipscomb noted that judgments of foreign countries, in the absence of legislative enactments, are held in most of the states "to be only *prima facie* evidence and will admit of almost every defense that could have been set up to the original action." *Id.* at 396. The Texas court was "inclined to yield to the authority of the generality of American decision" and granted the foreign judgment only a *prima facie*, not conclusive, effect. *Id.* at 397. Later the same year, Justice Lipscomb granted conclusive effect to an Alabama judgment. *Wellborn v. Carr*, 1 Tex. 463 (1847). Limiting *Phillips* to *in personam* judgments, *id.* at 468, he reasoned that foreign *in rem* judgments are conclusive, except where "the foreign court pronouncing the judgment or decree had no jurisdiction, or that it was fraudulently obtained." *Id.* at 468–69.

The distinction between *in personam* and *in rem* jurisdiction is more of a label than a test. The reality is that there is an element of artifice in using this conceptualization to grant or deny conclusive effect to foreign judgments. "[V]irtually every kind of legal relationship is susceptible of either conceptualization." James & Hazard, *supra,* at 637–38. Moreover, Phillips was decided nearly a half-century before *Hilton v. Guyot* and before the shift from prima facie to conclusive effect for foreign judgments which took place from the middle of the 19th century onwards. *See* Peterson, *supra,* at 229; R. von Mehren & Patterson, *Recognition and Enforcement of Foreign-Country Judgments in the United States*, 6 L. & Pol'y in Int'l Bus. 37, 44 (1974). In *Phillips*, the court was "inclined to yield to the authority of the generality of American decisions" and so granted only a *prima facie* effect; *id.* at 397; but its case support has now shifted and were it to follow the majority of the decisions today, conclusive effect would be granted. Indeed, the federal district court in *Compania Mexicana Radiofusora Fronteriza v. Spann*, 41 F.Supp. 907 (N.D.Tex.1941), *aff'd*, 131 F.2d 609 (5th Cir. 1942) purporting to apply Texas law, gave conclusive effect to a Mexican judgment.

Despite *Phillips'* direct confrontation of the recognition question, in light of *Hilton v. Guyot*, the case law shift to conclusive effect, and its limitation by *Wellborn*, it is of little precedential value. *See* Carl, *supra,* at 682–83. The closest thing to a modern Texas formulation of recognition [5] appears as dicta in *Banco Minero v. Ross*, 138 S.W. 224 (Tex.Civ.App.—San Antonio 1911), *aff'd* 172 S.W. 711 (1915). The Texas Supreme Court paraphrased the *Hilton v. Guyot* standard, stating:

There is no difficulty. we think, in determining the general principles of law which govern the standing of a judgment of a foreign country in our courts. Where there is a competent court, jurisdiction of the parties and the cause, an opportunity for a full and fair trial, regu-

---

5. No general statement of Texas law as to recognition is offered by the federal courts in

*Compania Mexicana Radiofusora Fronteriza v. Spann, supra.*

lar proceedings according to a system of civilized jurisprudence, likely to secure an impartial administration of notice between the citizens of its own country and those of other countries, with nothing to show either prejudice in the court or in the system of laws, or fraud in the procurement of the judgment, and there is no special reason why the country of the United States should not allow it effect, the merits of the case, in an action in this country, are not subject to retrial on account of errors of law or fact in the rendition of the judgment. *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95.

In *Banco Minero*, the *Hilton v. Guyot* principles were applied as to one defendant, denying recognition on the ground that he had not received an "opportunity for a full and fair trial." *Id.* at 714.

Its requirement of reciprocity aside, *Hilton v. Guyot* has a substantial following by courts in this country with respect to the recognition and enforcement of foreign-country judgments. R. von Mehren & Patterson, *supra*, at 45. *See also* Restatement, Second, Conflict of Laws § 98, Comment c. Its application is, however, unlike the relatively ministerial task of applying the constitutional requirements of full faith and credit in recognition of sister state judgments. Applying the *Hilton v. Guyot* principles of comity instead of a constitutional requirement in order to determine whether a foreign country judgment should be recognized presents difficult social and public policy judgments:

Comity is a recognition which one nation extends within its own territory as the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and the rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.

*Somportex Ltd. v. Philadelphia Chewing Gum Corp., supra*, at 440.

■■ Where, as here, the rendering forum's system of jurisprudence has been a model for other countries in the free world, and whose judges are of unquestioned integrity independent of the political winds of the moment, the judgment rendered is entitled to a more ministerial, less technocratic, recognition decisional process.[6] The basic elements needed to establish a prima facie case under a *Hilton v. Guyot* standard that conclusive effect should be given to a foreign country judgment—that the rendering court had jurisdiction over the person and subject matter, that there was timely notice and an opportunity to present a defense, that no fraud was involved, that the proceedings were according to a civilized jurisprudence—are the same for both favored and nonfavored systems. *Cf.* R. von Mehren, *supra*, at 403; *Toronto-Dominion Bank v. Hall, supra*, at 1014.[7] But the elements

6. English judgments have received special deference in our courts. As the district court in *Somportex Ltd.* stated:

In affording the English judgment the effect that we have, we are, of course, mindful that the system which rendered it is the very format from which our system developed; a system which has procedures and goals which closely parallel our own. Surely it could not be claimed that the English system is any other than one whose "system of jurisprudence [is] likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, . . . ." *Hilton v. Guyot, supra*, 159 U.S. at 202, 16 S.Ct. at 158.

318 F.Supp. at 166. *See also British Midland Airways Ltd. v. International Travel, Inc.*, 497 F.2d 869, 871 (9th Cir. 1974).

7. Or, as the second Restatement of the Conflict of Laws states:

A valid judgment rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States so far as the immediate parties and the underlying cause of action are concerned.

Restatement, Second, Conflict of Laws ¶ 98. Comment (c) elaborates this cryptic statement by quoting from *Hilton v. Guyot* for the "conditions to recognition."

of the prima facie case are more likely to be met and it is less likely that such prima facie cases would be rebutted for judgments from favored systems.

C. *Application of the Prima Facie Case.*

In this case, Hunt cannot seriously assert that there was not timely notice and opportunity to defend, that fraud was involved or that the proceedings were not rendered according to a civilized jurisprudence. The only elements of the *prima facie* case seriously challenged by Hunt are as to the rendering court's jurisdiction over him and over the subject matter.

■ Hunt asserts, correctly, that if the English court had no personal jurisdiction over him, the judgment should not be recognized. The record reflects, however, that the English court did have jurisdiction over Hunt, certainly as measured by British law. But as the court in *Cherun v. Frishman*, 236 F.Supp. 292, 296 (D.D.C.1964) noted:

> American writers agree that our own courts "require for recognition of the legal effect of foreign judicial proceedings that the foreign courts have jurisdiction, not as measured by the standards abroad but as measured by their own conception of what falls within the scope of permissible exercise of judicial power." Stumberg, Conflicts of Law 66–67 (3d ed.); Reese, The Status in This Country of Judgments Rendered Abroad, 50 Colum. L.Rev. 783, 789; 3 Freeman on Judgments, ¶ 1484. . . . [T]his Court feels that in the interest of affording United States citizens a reasonable degree of certainty as to when our own courts will, under principles of comity, enforce a judgment rendered against such citizens in foreign countries, the issue of whether the foreign country had jurisdiction over the United States national should be determined by our own standards of judicial power as promulgated by the Supreme Court under the due process clause of the Fourteenth Amendment.

*See also* R. von Mehren & Patterson, *supra,* at 48–49. We turn now to the jurisdiction of the English court over Hunt measured by our standards of judicial power under the due process clause of the Fourteenth Amendment and the subsidiary question of waiver.

■ Hunt appeared in the English action and litigated the merits after losing his jurisdictional challenge. Hunt even litigated his counterclaims. But trying the merits of the British suit after losing the jurisdictional argument is not a consent to the jurisdiction of the English court and a waiver of his due process rights to an appropriate forum. This is true despite the equitable appeal of Lord Denning's argument on behalf of waiver of jurisdictional objections upon contest on the merits that the defendant "cannot be allowed, at one and the same time, to say that he will accept the decision on the merits if it is favorable to him and will not submit to it if it is unfavorable." *In re Dulles' Settlement,* [1952] Ch. 842, 850, *quoted in,* A. von Mehren & Trautman, *Recognition of Foreign Adjudications: A Survey and A Suggested Approach,* 81 Harv.L.Rev. 1601, 1669 (1968). This court is part of a jurisprudential system which observes the limitations of the exercise of power by a court: in federal court, it is well established that a party who loses a timely challenge to the jurisdiction of the trial court and proceeds to litigate on the merits, can attack that judgment on appeal both on the merits and on jurisdictional grounds. 2A *Moore's Federal Practice* ¶ 12.12 at 2322 (2d ed. 1979); Wright & Miller, *Federal Practice and Procedure: Civil* § 1351 at 568 (1969). *See also* Tex.R.Civ.P. 120a(3) (Vernon). Litigating on the merits after loss on a jurisdictional challenge is thus not considered to be consent to jurisdiction.

■ The litigation of counterclaims by Hunt in the English action does not constitute a waiver of jurisdictional objections either, at least in the absence of proof or allegation that any of them were permissive counterclaims. Older cases have held that

by counterclaiming, a defendant "actively presses his claim thereby invokes the court's jurisdiction in the case so that he cannot therefore question the authority of the court to pass upon all questions raised between himself and his adversary." *Kincade v. Jeffery-Dewitt Insulator Corp.*, 242 F.2d 328, 332 (5th Cir. 1957). *See also Merchants Heat and Light Co. v. J. B. Clow & Sons*, 204 U.S. 286, 27 S.Ct. 285, 51 L.Ed. 488 (1907). However, this rule has been found by a number of modern courts to be unduly harsh. While waiver may be a reasonable result when the counterclaim raised is permissive, such waiver does not seem appropriate when a defendant is obliged to counterclaim. *See* Wright & Miller, *supra*, at § 1397; *Dragor Shipping Corp. v. Union Tank Co.*, 378 F.2d 241 (9th Cir. 1967).

Finding that Hunt cannot be said to have consented to jurisdiction on the record before it, the court turns to a minimum contacts analysis in order to determine if the English court's exercise of jurisdiction comports with our own notions expressed in due process terms. As the Supreme Court recently noted:

> In *Shaffer v. Heitner* [433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683], we held that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." 433 U.S., at 212, 97 S.Ct., at 2584. That is, a State may exercise jurisdiction over an absent defendant only if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In determining whether a particular exercise of state-court jurisdiction is consistent with due process, the inquiry must focus on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, *supra*, 433 U.S., at 204, 97 S.Ct., at 2580.

*Rush v. Savchuk*, 444 U.S. 320, 327, 100 S.Ct. 571, 577 (1980).

Hunt's contacts with England are of such an extent and of such nature that the maintenance of this suit does not offend fair play and substantial justice. Moreover, it is not unfair or unreasonable to require Hunt to defend the suit in England. *See Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 497–98 (5th Cir. 1974); 2 *Moore's Federal Practice* ¶ 4.25[5] at 4–262.

Hunt has engaged in much purposeful activity in England directly related to Hunt and BP's cooperative venture in Libya. Indeed, the contract which brought BP and Hunt into a working relationship on the concession whose expropriation is at the root of this litigation was executed in England. Earlier orders have found that there were more contacts with England than with Texas. On November 4, 1975, in the High Court of Justice, Queen's Branch Division, Commercial Court, Mr. Justice Kerr noted in his opinion that "as between England and Texas the former was clearly intended to be the centre of gravity of the contractual arrangements and the primary place of business." *Id.* at 18. And in the Northern District of Texas, Judge Hill recognized that "London appears to have been more the focus of the parties' activities than Texas." Order Overruling Motion to Dismiss, March 17, 1976, at 4.

Hunt has personally traveled to England to participate in meetings with BP. Hunt states in his September 4, 1975, affidavit that:

> I have in the past and do presently visit England from time to time for various reasons. My trips there are not regular in nature, but are generally related to some specific event.

> On a number of occasions, since 1960, I have visited with officials of or representing BP Exploration Company (Libya) Limited or its parent, the British Petroleum Corporation Limited, both in London and in Dallas.

Hunt attached, among others, an affidavit of Jim Osborne (Hunt's Manager of Libyan Operations and Representative to BP) in support of the "Memorandum of Plaintiff Nelson Bunker Hunt in Opposition to De-

fendant's Motion to Dismiss, or in the Alternative, to Stay Proceedings." Osborne's affidavit attached as exhibits the minutes of "two fairly typical quarterly meetings." Exhibit A clearly indicates that there were representatives of both BP and Hunt present at the "BP/Bunker Hunt Quarterly Meeting" held in London on January 18, 1968. Discussions were detailed, dealing with such issues as the handling facilities at Tobruk, the results of a hydrogeological survey in Concession 65, and reservoir pressure changes in the Sarir field. Also attached were the minutes of the quarterly meeting held in London on October 19, 1967, indicating similarly detailed discussions. Hunt himself attended this October 19 meeting.

Second, while Hunt in his name might not have maintained an office in England,[8] he had agents resident in England to represent his interest. The fourth interrogatory in the defendants' first set of interrogatories in *Hunt v. Mobil Oil Corp.*, 75 Civ. 1160 EW (S.D.N.Y.) asked:

> 4. Describe the organizational structure for all of your past or present business activities pertaining to the exploration or production of crude oil in Libya or marketing of such crude oil, including, but not limited to, the identity of each division, department, section or similar unit, and describe for each such unit its functions and responsibilities and identify the person in charge thereof.

In his answer, dated July 16, 1975, Hunt stated in pertinent part:

> Up until the nationalization in June 1973, Sarir fields operation headquarters were located at N.B. Hunt, Box 20, Benghazi, Libya. . . .
>
> . . . . .
>
> A London office at 192 Sloane Street, London, England, was responsible for liaison with BP, the marketing of crude oil and the supervision of the Libyan office and operations. The following individuals, for the time periods indicated, were in charge of that office:

| | | |
|---|---|---|
| Michael Condon | – | 1966–1968 |
| George Williamson | – | 12/68–10/69 |
| Henry Schuler | – | 2/70–8/74 |
| Michael Condon | – | 8/74–present |

Moreover, considering "such things as the interest of the state in providing a forum for the suit, the relative conveniences and inconveniences to the parties, and basic equities," litigating in England was neither unfair nor unreasonable. *See Product Promotions, Inc. v. Cousteau, supra*, at 497–98. As Hunt himself states in referring to the 1960 and 1967 agreements:

> . . . it is clear that BP's principal place of business was in London, while Hunt's principal place of business was Dallas, and it is reasonably inferable that the contracts anticipated activities at both those locations, as well as Libya.

Memorandum of Plaintiff Nelson Bunker Hunt in Opposition to Defendant's Motion to Dismiss, or in the Alternative, to Stay Proceedings, at 4. England has a legitimate and reasonable interest in providing a forum for this suit; BP is a resident there, the 1960 contract was executed there, and the English statute was of relevance in resolving the suit. *Cf. Product Promotions, Inc. v. Cousteau, supra*, at 498. Texas is a more convenient forum for Hunt, while England is more convenient for BP; given, however, the international nature of their relationship, the hardship to Hunt from defending in England does not rise to the level of deprivation of due process. Nor was there here any peculiar inequity to litigating in England. It was planned that "much of the administrative and ancillary activities relating to the contract with Mr. Hunt would take place in London," Judgment, November 4, 1975, at 18, and Hunt's agents were present in London and at the quarterly meetings in London. Hunt pur-

---

8. Hunt asserts in his September 4, 1975 affidavit:

> . . . nor do I maintain an individual office in England. There is an office in London maintained in the name of certain corpora- tions in some which I am a shareholder. The manager of that office, Mr. Michael Condon, is not on my payroll, although he does perform certain services on my behalf, as requested.

posefully availed "itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). If these administrative matters were, as intended, handled in England, the court fails to see any hardship to litigating there as well.

In essence then, the court finds that the maintenance of the suit against Hunt in England comports with "traditional notions of fair play and substantial justice." Hunt's due process rights are not being violated by the maintenance of the English suit.

 Hunt next argues that the English court lacked subject matter jurisdiction. BP contends that since the High Court of Justice is the appropriate English trial court of general jurisdiction, it had subject matter jurisdiction. It is true that subject matter jurisdiction of a foreign court can be reexamined by a recognizing court, *Liverpool & London & Globe Ins. Co. v. Lummus Cotton Gin Sales Co.*, 6 S.W.2d 728 (Tex. Com.App.1928), but Hunt has not raised a meritorious claim as to the lack of subject matter jurisdiction of the English court. Hunt's assertion depends on the assumption that "[i]n the English case, subject matter jurisdiction had to be founded upon a contract governed by English law." Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 26. No authority is cited for this proposition. What does follow by way of support are arguments about the merits of the substantive holdings of the English court: Hunt asserts that (1) the Law Reform (Frustrated Contracts) Act of 1943 has no application to contracts which are not governed by English law; (2) that BP's rights to the production payment cannot be governed by English law; and (3) Texas law applies. Given the rendering court's general jurisdiction, even if only Texas law applies and no English law applies (a position rejected by that court), the English court had subject matter jurisdiction.

 The court finds then that the basic elements for a prima facie case for recognition of the English judgment have been established. The court turns to the reasons Hunt offers for denying recognition in spite of this.

## IV.

### A. *Public Policy.*

Hunt first argues that the English judgment violates the public policy of Texas and the United States and so should be denied recognition. The argument is: (1) English courts no longer accept American judgments based upon American statutes; (2) the judgment is based on an English statute which abrogated the common law of England; (3) the judgment imposes a statutory penalty in the absence of any wrongdoing by Hunt; and (4) the English judgment is in violation of American public policy because it abrogates the fundamental right to contract. These assertions do not support denial, even assuming arguendo that (1) is true.

 Hunt's argument that an American judgment would not be recognized in England and so should not, on public policy grounds, be recognized here is in essence an assertion that reciprocity is an essential element of recognition. The court disagrees.

Though the *Hilton* case required reciprocity as a condition of recognition, American decisions since *Hilton* have moved "decisively away from the requirement of reciprocity as a condition of recognition." R. von Mehren & Patterson, *supra*, at 46. *See, e. g., Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, *supra*, at 440 n. 8. *Fairchild, Arabatzsis & Smith, Inc. v. Prometco (Produce & Metals) Co., Ltd.*, 470 F.Supp. 610, at 615 n. 4 (S.D.N.Y.1979). *But see Her Majesty v. Gilbertson, supra* at 1164 n. 6, 1165–66 (enforcement of judgment rendered for taxes by courts of foreign government). Indeed, the draftsmen of the Uniform Foreign Money Judgment Recognition Act, "consciously rejected reciprocity as a factor to [consider] in recognition of foreign money judgments . . . ." *Bank of*

*Montreal v. Kough,* 612 F.2d 467, 471 (9th Cir. 1980).[9]

There is little justification for judicial imposition of a reciprocity requirement. An argument often made is that reciprocity encourages foreign courts to recognize U.S. judgments. Yet, requiring reciprocity would arbitrarily penalize "private individuals for positions taken by foreign governments and . . . such a rule has little if any constructive effect, but tends instead to a general breakdown of recognition practice." A. von Mehren & Trautman, *supra,* at 1661. Application of reciprocity would also reduce predictability in the recognition of foreign court judgments: the reciprocity rule is difficult to apply both because of uncertainty as to just how much foreign recognition of American judgments should be considered adequate and because courts are ill-equipped to determine foreign law. Comment, *supra,* at 348–49. Moreover, even if reciprocity can be used to bring pressure on foreign countries to recognize American judgments, such utilization of reciprocity would probably be more effective and appropriate as part of executive or legislative action. Comment, *supra,* at 346; A. von Mehren & Trautman, *supra,* at 1661–62.

The law in Texas as to reciprocity is not clear. While there is suggestion in *Banco Minero,* 138 S.W. at 238 that reciprocity is an element in recognition, the Texas Supreme Court made no reference to reciprocity in affirming the lower court decision (though the Supreme Court did seem to adopt *Hilton v. Guyot*). The *Wellborn* case made no mention of reciprocity when it enforced a foreign judgment and while the district court in *Spann* did mention that in

Mexico the "system of reciprocity had been adopted," *id.* at 909, it did not explicitly require reciprocity as an element for giving recognition. The Fifth Circuit affirmed, "approv[ing] that opinion as a correct statement both of the facts and of the applicable law . . . ," without mentioning reciprocity. *Spann v. Compania Mexicana Radiofusora Fronteriza,* 131 F.2d at 610. Not having plainly committed themselves in the past, the court is of the opinion that Texas courts will not hereafter adopt this oft-criticized concept. *Cf. Somportex, Ltd. v. Philadelphia Chewing Gum Co.,* 318 F.Supp. at 168, 453 F.2d 435 (3d Cir.), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972).

■ Hunt's assertion that the English judgment offends both Texas and American public policy because the judgment is based on an English statute which abrogated the common law of England is without merit. Taken to its conclusion, this principle would mean that no foreign judgment could be recognized if it is based on law which is contrary to the English common law. Conformity with the common law is not an element of recognition.

Third, Hunt asserts that the judgment, based on the Act, is a form of "statutory penalty," in that Hunt was not guilty of any breach of contract "when he is not at fault." Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 29–30.[10] Hunt's "statutory penalty" argument fails. The meaning of "statutory penalty" as used here is not clear. It appears to be a characterization of the circumstance that Hunt entered into a business transaction upon an express agreement that he would not be personally liable for any

---

9. In a recent analysis of the reciprocity rule, one observer noted:

 . . . *Erie* freed a number of federal courts to look to state law in considering the applicability of the reciprocity rule. In the instances where these courts found no state policy they often rejected reciprocity in strong terms. Of the state court side of this situation, the author could find no recent cases addressing the enforcement of foreign judgments for the first time. However, if the trend in the federal courts is any indication

about prevailing judicial sentiment concerning the rule, the answer would seem to be clear that rejection of the rule is the order of the day.

Comment, *The Reciprocity Rule and Enforcement of Foreign Judgments,* 16 Colum.J. Transnat'l L. 327, 343 (1977).

10. This court does not challenge the principle that foreign country penal and tax judgments may not be enforceable in the United States.

breach, but finds himself held liable to the tune of some $35 million—by virtue of a British statute, and not the common law. Hunt states:

> BP also criticizes Hunt's use of the term "statutory penalty" for the English judgment. This nomenclature is completely appropriate. Hunt was a party to a contract which provided for "no personal liability." Hunt neither breached any contractual obligation to BP nor was he guilty of any wrongdoing. BP has now obtained a judgment against Hunt for approximately $35 million. BP could not have recovered against Hunt on any contractual obligation or by reason of English common law or equity. On the contrary, the English trial court has decreed that Hunt is personally liable to BP for such sum as the sole basis of an English statute. The appellation "statutory penalty" is entirely proper.

Reply of Plaintiff to Defendant's Reply Memorandum in Support of Defendant's Motion for Summary Judgment, at 7.

██ The Act is no more, but no less, than a legislative scheme to allocate losses suffered by parties when a court discharges full performance of a contract, Note, *Apportioning Loss After Discharge of a Burdensome Contract: A Statutory Solution*, 69 Yale L.J. 1054, 1056 (1960); the statute cannot be considered penal. Indeed, the statute has distinct common law roots. The law was passed in response to the Lord Chancellor's suggestion in *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.*[11] [1943] A.C. 32, that it was for the legislature to decide whether "provisions should be made for an equitable apportionment" between the parties in losses like *Fibrosa*. F. Kessler & G. Gilmore, *Contracts: Cases and Materials* 792 (2d ed. 1970). *See also* J. Calamari & J. Perillo, *The Law of Contracts* 312–14 (1970).

██ Moreover, as one of the authorities Hunt himself cites in support of its statutory penalty argument notes:

Even when clearly penal decrees are involved, a distinction must be drawn between recognition and enforcement; although a U.S. court certainly will not impose a foreign country's penalties for violation of that country's laws, the court will recognize penal judgements by deeming them conclusive with respect to the violation of foreign law if the issue is raised in a proceeding in the United States.

R. von Mehren & Patterson, *supra*, at 64. In this action, BP does not seek affirmative relief but only to have the judgement recognized in the sense that this matter had already been decided by the judgement and thus need not be litigated further. See *id.* at 38.

██ Fourth, Hunt argues that the English judgment violates Texas public policy because it permits the recovery of prejudgement interest on a sum which was uncertain until time of judgement. United States courts generally declare that comity does not require them to recognize a foreign judgement if to do so would contravene public policy. Although the decisions are not entirely consistent in application, they normally will not deny recognition "merely because the law or practice of the foreign country differs, even if markedly from that of the recognition forum." R. von Mehren & Patterson, *supra*, at 61. The level of contravention would have to be high before recognition would be denied on public policy grounds. Indeed, all four of the cases cited in support of this argument illustrate this very point.

In *Spann*, the plaintiff sought to enforce a judgement for costs which had been rendered against the defendant as the unsuccessful plaintiff in an action instituted in Mexico. In rejecting defendant's public policy defense, the district court stated:

> That we do not have in Texas a statute which authorizes the imposition of costs which may include the defender's expenditures for an attorney will not sustain the claim that it is against the public policy

---

11. *Fibrosa* is cited as controlling in Texas by plaintiff. Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 28–29.

of Texas for such a judgment to be entered, unless that claim is supported by a decision or statute. The class of the suit, and its complexion, is not to be taken as determinative of its objectionableness so as to require a democratic court to deny recovery upon a foreign judgment granting such recovery.

The "public policy" of a state must be defined, diagramed, well-pointed. The very words themselves, so indicate. Courts do not deal with prophecy. They deal only with the present.

*Id.* at 909.

In *Toronto-Dominion Bank v. Hall, supra,* the court supported the public policy defense in a suit brought to enforce a judgment rendered against him in Canada on a contract guaranty payment of promissory notes, holding:

Enforcement of a judgment of a foreign court based on the law of the foreign jurisdiction does not offend the public policy of the forum simply because the body of foreign law upon which the judgment is based is different from the law of the forum or because the foreign law is more favorable to the judgment creditor than the law of the forum would have been had the original suit been brought at the forum. The very idea of a law of conflicts of law presupposes differences in the laws of various jurisdictions and that different initial results may be obtained depending upon whether one body of law is applied or another.

Considering that the rights conferred upon the Bank by the contract documents, including the contract of guaranty, were broad, and conceding that they may have been broader than could have been conferred legally upon a lender in Arkansas, the Court does not consider them to be shocking, immoral, unconscionable, or unreasonably oppressive.

*Id.* at 1016.

The public policy defense was similarly rejected in *Somportex* with similar facts similar to this suit. English law permitted recovery as compensatory damages in breach of contract two items not recovera-

ble under Pennsylvania law, these two items forming substantial portions of the English judgment. The variance between English law and the law of Pennsylvania was held not "such that the enforcement 'tends clearly to injure the public health, the public morals, the public confidence in the privity of the administration of the law, or to undermine that sense of security for individual rights, whether if personal liberty or of private property, which any citizen ought to feel, is against public policy.'" *Id.* at 443.

Finally, in *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979), the Texas Supreme Court stated that "Texas courts will not enforce a foreign law that violates good morals, natural justice or is prejudicial to the general interests of our citizens," *Id.* at 321. In rejecting the "dissimilarity doctrine," wherein laws of another state would not be applied because of dissimilarity in the laws of Texas, the court noted that Mexican and Texas law differed in several respects, "the mere fact that [various] aspects of the law differ from ours does not render them violative of public policy. Furthermore, there is nothing in the substance of these laws inimical to good morals, natural justice, or the general interests of the citizen of this state." *Id.* at 322.

 Even assuming that the recovery of prejudgment interest on a sum which was uncertain until time of judgment is permitted by English law and would not be permitted in Texas, this dissimilarity with Texas law cannot be said to rise any higher than the dissimilarities found tolerable in *Somportex, Spann,* or *Gutierrez.*

Finally, Hunt asserts that the English judgment is in violation of American public policy because it violates the fundamental right to contract by requiring Hunt to personally pay a judgment contrary to contractual provision. The argument is little more than a quarrel with the substantive law of England. Unless categorized as violative of good morals and natural justice in the *Gutierrez* sense, that quarrel reduces to an argument that preclusive effect ought to be denied.

## B. *Indispensable Parties.*

Hunt next alleges that the English judgment is not entitled to recognition because the English court lacked jurisdiction over two indispensable parties, *i. e.*, Libya and AGECO. Hunt asserts that they were indispensable because BP had transferred all of its rights regarding Concession No. 65 to Libya and Libya had previously transferred such rights to AGECO.

First, Hunt believes that this resulted in BP having transferred all of its rights in Concession No. 65 to Libya, so that it could not later claim any of those rights against Hunt. The ownership of the claim sued upon was at least impliedly resolved in the British court. This was a matter for defense on the merits in the English action. It cannot be litigated here.

Second, Hunt believes that, contrary to English law, the English court purported to determine the rights of Libya and AGECO even though they were not parties to the English action. The quick answer is that Hunt has no standing to raise the rights of third parties, and this was a matter for defense on the merits in the English action.

Third, Hunt asserts that it was denied due process by the rendering of the decision in the absence of Libya and AGECO because the English judgment does not protect Hunt from having "to pay on the same obligation twice." Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 19. *See Western Union Telegraph Co. v. Pennsylvania*, 368 U.S. 71, 82 S.Ct. 199, 7 L.Ed.2d 139 (1961). Hunt does not specify just what obligation may have to be paid twice. If the inquiry was whether Libya or AGECO (and government corporation) could recover on "reimbursement oil," Justice Goff appears to have already rejected this possibility. *See* Judgment, June 30, 1978, at 15. Indeed, the May 19, 1975 settlement earlier noted between Hunt and Libya would appear to preclude double recovery. The Hunt-Libya agreement provided, among other things, that "[Libya] acknowledges full and final settlement it may have as successor in interest to BP Exploration Company (Libya) Limited." Finally, because this court is staying proceedings in this case, Hunt might have the opportunity to make the "double recovery" argument on appeal in England. Under United States practice there may be an opportunity to do so: "an appellate court, *sua sponte* if necessary, may consider it although the point was not raised in the trial court." 3A *Moore's Federal Practice* ¶ 19.05[2] at 19–91 (2d ed. 1979).

## C. *International Law.*

Next Hunt argues that the English judgment is not entitled to recognition because it violates international law, specifically, what is alleged to be "the most elementary and generally recognized principle of international law," the validity and binding effect of contracts. Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 33. International law, in turn, is said to be part of the law of the United States. The English judgment is said to violate international law (and hence U.S. law) because the agreement between Hunt and BP provided that there would be "no personal liability" on Hunt. Even assuming that the binding effect of contracts is a fundamental principle of international law [12] and that the validity of a contractual provision is not affected by frustration of the contract, Hunt's argument would fail. This international law argument is but a recasting of the public policy argument;

---

12. What international law actually calls for in any particular situation could be a difficult exercise, in part because of its nature and sources are different from the domestic law system. *See, e. g.*, W. Bishop, *International Law: Cases and Materials*, 3–62 (3d ed. 1971); Note, *Thaw in International Law? Rights in Antarctica under the Law of Common Spaces*, 87 Yale L.J. 804, 808 n.11 (1978) (central role of historical or customary practice in international law); Onuf, *International Legal Order as an Idea*, 73 Am.J. Int'l L. 244, 244 (1979); Young, *International Law and Social Science: The Contributions of Myres S. McDougal*, 66 Am.J. Int'l L. 61, 62 (1972).

but as earlier discussed there must be more than a mere dissimilarity in law to be ground for nonrecognition.

There is another, independent reason why Hunt cannot rely on international law. It is doubtful that Hunt, as a private individual, would have standing to raise as a cause of action or as a ground for defense, violation of customary[13] international law. Not having standing to raise international law directly, he cannot have any more right to raise it indirectly, as a defense to recognition of a foreign judgment. Even where the United States enters into a treaty with another nation, and such treaty by the Constitution becomes the supreme law of the United States, unless the treaty is self-executing it must be implemented by legislation before it gives rise to a private cause of action. *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1298 (3d Cir. 1979). As for customary international law, the Second Circuit has stated:

> There is a general consensus . . . that [the law of nations] deals primarily with the relationship among nations rather than among individuals. "It is termed the Law of Nations—or International Law—because it is relative to States or Political Societies and not necessarily to individuals, although citizens or subjects of the earth are greatly affected by it." von Redlich, *The Law of Nations* 5 (2d ed. 1937). . . .
>
> Like a general treaty, the law of nations has been held not to be self-executing so as to vest a plaintiff with individual legal rights. *Pauling v. McElroy, supra,* 164 F.Supp. at 393. It has been held inapplicable to torts such an unseaworthiness of a vessel and failure to provide a seaman

with a safe place to work, *Damaskinos v. Societa Navigacion Interamericana, S.A. Panama,* 255 F.Supp. 919, 923 (S.D.N.Y. 1966), and to the right of a Russian citizen to recover the proceeds of a life insurance policy . . .

(footnote omitted) *Dreyfus v. Von Finck,* 534 F.2d 24, 31 (2d Cir. 1976), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976).

### D. *Effect of the Appeal.*

Hunt next argues that the English judgment is not entitled to recognition because it is now on appeal; and the decision of the Court of Appeal will be subject to review by the House of Lords. "It is unsettled whether an American court will apply the foreign court's rules of *res judicata* and collateral estoppel when called upon to recognize the foreign court's judgment." *Fairchild, Arabatzis & Smith v. Prometco (Products & Metals), supra,* at 616. In the absence of Texas precedent on the effect of an appeal in a foreign country judgment on its res judicata effect, it is doubtful that a Texas court will grant more conclusive effect to a foreign country judgment being appealed than a Texas judgment being appealed.[14] Existing precedent on comity, the principle under which foreign country judgments are recognized, lends support to this assumption. *See Hilton v. Guyot, supra.* In *Williams v. State of Washington,* 566 S.W.2d 54 (Ct.Civ.App.—Dallas, 1978), the State of Washington sued Ralph Williams individually and Ralph Williams, Inc., seeking in Texas to enforce a judgment rendered in the State of Washington. After noting that regardless of whether the judgment was final for appeal purposes under Washington law because the Washington

---

**13.** "Customary, as distinguished from conventional, international law is based upon the common consent of nations extending over a period of time of sufficient duration to cause it to become crystallized into a rule of conduct." Hackworth, 1 Digest of International Law 1 (1940), *quoted in,* Bishop, *supra,* at 3.

**14.** *Cf.* The Uniform Foreign Money-Judgments Recognition Act, adopted by 11 states as of 1979, provides:

> If the defendant satisfies the court either that an appeal is pending or that he is entitled and intends to appeal from the foreign judgment, the court may stay the proceedings until the appeal has been determined or until the expiration of a period of time sufficient to enable the defendant to prosecute the appeal.

*Uniform Laws Annotated: Civil Procedural and Remedial Laws,* 276 (1975) and Supp. (1979) at 68.

judgment remained subject to modification, the judgment was not entitled to full faith and credit, the Texas Court of Civil Appeals (Dallas) rejected Washington's argument that the judgment should be enforced on the basis of "comity." *Id.* at 56. The court noted that in Texas even a domestic judgment could not be enforced by execution unless they disposed of all claims and parties involved in the litigation, and that *"[a] foreign judgment cannot be accorded greater dignity than a Texas judgment."* (emphasis added) *Id.*

The effect of an appeal on a Texas judgment's res judicata effects was stated by the Texas Supreme Court in *Texas Trunk Ry. Co. v. Jackson*, 85 Tex. 605, 22 S.W. 1030 (1893):

> We are of opinion that appeal or writ of error, whether prosecuted under cost or supersedeas bond, during pendency deprives a judgment of that finality of character necessary to entitle it to admission in evidence in support of the right or defense declared by it; and from this necessarily follows the insufficiency of a plea in bar based on it. That, under the statute, execution may be issued and the judgment be enforced during the appeal when only a cost bond has been given, does not affect the question for this is by virtue of the statute, which does not undertake to determine the status of the judgment in reference to any matter involved in the questions certified.

*Id.* at 1032.

In *Ray v. Hasley*, 214 F.2d 366 (5th Cir. 1954), plaintiff brought an action for damages resulting from an automobile collision in federal district court the day after judgment was entered in an action in a Texas state court on the same cause and between the same parties. The defendant moved to dismiss on account of such prior action. When the motion to dismiss was heard, the state court proceedings had progressed to the point where an appeal was in process. The federal district court sustained the motion to dismiss, stating that "[t]his is a plain case of res judicata." *Id.* at 368. The Fifth Circuit reversed and remanded with directions to stay proceedings before it until a final termination of the proceedings in the state court holding that:

> In Texas, the rule seems well established that the pendency of an appeal from a judgment prevents its operation as res judicata.
>
> . . . . .
>
> It may be that irrespective of whether the judgment in the state court operated in res judicata pending appeal, the federal court should take into consideration the possibility of a reversal of that judgment . . . and should mould its orders and judgment so as to avoid any conflict of jurisdiction and to accomplish substantial justice. The federal court may properly stay proceedings before it until a final termination of the proceedings in the state court.

(footnote omitted) *Id.* at 368. *See also Glen Oaks Utilities, Inc. v. City of Houston*, 280 F.2d 330, 334 (5th Cir. 1960).[15]

---

15. Defendant's citation to Texas law is limited to *Moody v. State*, 520 S.W.2d 452 (Ct.Civ.App. —Austin 1975, writ ref'd n. r. e.) and a case relying on *Moody, Schwartz v. Vecchiotti* 529 S.W.2d 603 (Tex.Civ.App.—Houston [1st Dist.], 1975, writ ref'd n. r. e.) (*Prager v. El Paso National Bank*, 417 F.2d 1111, dealt with the effect of a New Mexico suit on citizens in Texas. Although it did not explicitly so state, under choice of laws rules, it likely applied the law of New Mexico, not the law of Texas. *Fidelity Standard Life Insurance Co. v. First National Bank & Trust Co. of Videlia, Ga.*, 510 F.2d 272, 273 (5th Cir. 1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 125, 46 L.Ed.2d 94, looked at Louisiana law.)

*Moody* and *Vecchiotti* are not applicable to this case. Both cases were suits involving enforcement of sister state judgments, not ones wherein the res judicata effects of earlier litigation was involved, a distinction *Texas Trunk* made important. Moreover, because the initial judgments were rendered not in Texas, but rendered in a sister state, it is arguable that the relevant state law as to res judicata effects was that of the foreign state, and not Texas. Any discussion of Texas law is thus dicta. *Cf. General Exploration Co. v. David*, 596 S.W.2d 145 (Tex.Ct.Civ.App.—Houston, 1979). Finally, on appeal in *Moody*, the Texas Supreme Court noted the argument of a party seeking denial of full faith and credit based on Texas decisions which hold that a foreign trial

This interpretation of how a Texas court would likely decide the question of the effect of a pending appeal is supported by *Trevino v. Fernandez*, 13 Tex. 630 (1855). In *Trevino*, the parties were litigating in a Texas court the ownership to land, half of which had been adjudged by a Mexican court in 1842. *Id.* at 662. The plaintiffs asserted that the Texas republic had defined its boundaries in 1836 such that the land was in Texas, and hence the Mexican court did not have jurisdiction. *Id.* at 662. Defendants asserted that the land, though claimed by Texas, was under the laws and control of Mexico, and was not actually conquered by Texas until 1846. *Id.* at 662. The Texas Supreme Court found that "the assumption as to the force of the Mexican authorities is well founded." *Id.* at 663. Nevertheless the Texas court held that the Mexican decree was not conclusive on the ground that the decree "was not final when the Mexican authorities ceased to have jurisdiction." *Id.* at 666. The Texas court noted that an appeal was then pending and that:

> . . . if the sentence had been reversed on appeal, these proceedings would have gone for nothing, and the plaintiffs would not have been restored to their original possession. In this condition of the proceedings the plaintiffs have a right to insist that there was no final decision against them, and that they are not restrained by the adjudication and proceedings under it, from asserting their rights in a new and distinct action.

*Id.* at 666–67.

■ In sum, it is likely that Texas courts will not permit a foreign country judgment to have res judicata effects until appeals have been exhausted. Following *Ray v. Hasley, supra*, it is necessary for this court to stay the proceedings until a final determination of the proceedings in England.

*V.*

Many of the reasons for recognition and enforcement of foreign country judgments are the same as for giving conclusive effect to domestic judgments: prevention of harassment of the successful party, elimination of duplicative judicial proceedings, and providing some measure of settled expectations to the parties. *Cf.* Peterson, *supra*, at 240. In a domestic context, the benefits of preclusion are palpable. In our Union, since courts in each state are subject to due process limitations, are subject to the same overlap of federal laws and the Constitution, are sharing to a large extent the same body of court precedents and socio-economic ideas and are presumptively fair and competent, the benefits of giving conclusive effect are not balanced by any recognizable costs. Giving an automatically conclusive effect—full faith and credit—to sister state judgments could be fully justified on the grounds of fairness to litigants and judicial economy; there is no reason for a second trial—the rendering forum had at least the constitutionally requisite contacts with the litigant, there is little possibility of an error in the rendering forum and the substantive policies effect by that forum are likely fully acceptable in the recognizing forum.

The benefit-cost calculation for giving an automatically conclusive effect to foreign country judgments is far less favorable. There is less expectation that the courts of a foreign country will follow procedures which would comport with our notions of due process and jurisdiction and that they will apply substantively tolerable laws. Moreover, especially if the loser in the initial litigation is American, there will be suspicions here of unfairness or fraud. The modern versions of the *Hilton v. Guyot* rule—neither pretending that the initial litigation never occurred, nor giving an automatic conclusive effect—is a natural and tempered response to the tension between the benefits and costs of giving effect to foreign country judgments. By going to

court is not entitled to full faith and credit when that judgment is on appeal. 547 S.W.2d 958, 959. The Supreme Court was silent on this argument, but significantly, relied on the

fact that the Supreme Court of the rendering state had mooted the argument by affirming the lower court decision.

the halfway house, courts can deny effect to foreign country judgments when the rendering court has acted when in ways intolerable by our country's then felt ideal of fundamental fairness.

In this case, the *Hilton v. Guyot* mode of analysis did not call for a full technocratic analysis of benefit and cost. Because this was an English judgment, in the absence of proof to the contrary, it was not necessary, for example, to gauge the fairness of the initial trial. In sum, a litigant is entitled to no more than one clean bite of one clean apple—at least at the table of our British brethren.

Proceedings in this action are stayed until the final termination of appeals in England.